**[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 280.]**

BUCKEYE UNION INSURANCE COMPANY, RESPONDENT, *v*. NEW ENGLAND
INSURANCE COMPANY, PETITIONER.

[Cite as *Buckeye Union Ins. Co. v. New England Ins. Co.*, 1999-Ohio-67.]

*Insurance—Insurer found guilty of bad faith with actual malice in failing to settle*
*a tort case against its insured—Such conduct does not constitute the type of*
*intentional tort that is uninsurable under Ohio law.*

(No. 98-1268—Submitted March 10, 1999—Decided December 22, 1999.)

ON ORDER from the United States Court of Appeals for the Sixth Circuit
Certifying Questions of State Law, No. 97-3356.

————————

{¶ 1} Buckeye Union Insurance Company ("Buckeye") brought this underlying action in federal district court to recover under a professional liability insurance policy issued to it by New England Insurance Company ("New England"). Pursuant to the policy, New England agreed to indemnify Buckeye as to any:

"(A) Loss which the Insured shall become legally obligated to pay, from any claim made against the Insured during the Policy Period, by reason of any act, error or omission committed or alleged to have been committed in the rendering of or the failing to render professional services.

"(B) Costs and expenses incurred by the Insured in the defense of any claim for which coverage is provided by this Policy."

{¶ 2} The policy contained an exclusion from coverage that set forth that "this Insurance shall not cover any Insured whose personal dishonesty, fraudulent breach of trust, or intention to deceive or defraud has been finally adjudicated or may be established."

**{¶ 3}** The policy is at issue because of events that began to unfold over twenty years ago. Various incarnations of the case have been winding their way through the legal system since then—one aspect was decided by this court in *Leber v. Smith* (1994), 70 Ohio St.3d 548, 639 N.E.2d 1159 ("*Leber II*"), which more fully sets forth the underlying facts. Briefly, on April 7, 1979, Erie County Deputy Steven Smith, while attempting to apprehend Eugene Leber, accidentally shot Leber, rendering him a paraplegic. In June 1983, Leber and his parents filed a personal injury action in the Erie County Court of Common Pleas against Deputy Smith, the Sheriff of Erie County, and the Board of Commissioners of Erie County ("Board"). ("*Leber I*")

**{¶ 4}** At the time of the accident, the Sheriff's department was insured by American Home Assurance Company, while the Board and its employees were insured by Buckeye.

**{¶ 5}** Prior to the trial, the Lebers offered to settle for the limits of both insurance policies. Buckeye refused the settlement offer, claiming that the Board was not liable to the Lebers, since Smith was not an employee of the Board. The trial jury found that both Deputy Smith and the Sheriff were negligent, and awarded the Lebers damages in the amount of $10,390,000, which the trial judge remitted to $10,150,000. The trial judge also ruled that the Board was vicariously liable as a matter of law.

**{¶ 6}** Both sides appealed the verdict but dismissed the appeals when they reached a settlement agreement. As part of the settlement agreement, the Board assigned its indemnity rights against Buckeye to the Lebers.

**{¶ 7}** Leber, as the Board's assignee, then sued Buckeye for bad-faith refusal to settle Leber's claim against the Board ("*Leber II*"). The jury in that case returned a verdict against Buckeye, finding in jury interrogatories that "Buckeye Union Insurance Company's conduct in failing to settle the Leber's [*sic*] claims was motivated by actual malice," and that Buckeye's conduct "imported a dishonest

2

purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud or embracing actual intent to mislead or deceive another." The trial court entered a total judgment of $13,336,232.80 against Buckeye.

{¶ 8} Buckeye launched a successful appeal. The court of appeals reversed the trial court, holding that since Buckeye's insured was not liable for the injury caused by Deputy Smith, Buckeye could not have acted in bad faith in refusing to settle the Lebers' claim. This court, however, reversed the court of appeals and reinstated the jury verdict against Buckeye.

{¶ 9} On December 14, 1994, Buckeye paid $23,044,279.28 to the Lebers, which included $9,708,046.48 in postjudgment interest. After paying the Leber judgment in full in December 1994, Buckeye made a claim for reimbursement under the professional liability policy issued by New England. New England refused the claim. On April 27, 1995, Buckeye brought the present underlying suit in the United States District Court for the Northern District of Ohio against New England, seeking a declaration of coverage under the policy and seeking damages for New England's breach of contract.

{¶ 10} Both parties filed motions for summary judgment. The judge granted New England's motion, ruling that the *Leber II* jury verdict and interrogatory answers judicially established that Buckeye had committed an intentional tort with an intent to injure, therefore precluding any insurance coverage.

{¶ 11} Buckeye appealed to the Sixth Circuit Court of Appeals. That court has certified three questions to this court:

"1. When an insurance company is found by Ohio courts to be guilty of 'bad faith' with 'actual malice' because it failed to settle a tort case against its insured, does such conduct constitute the type of intentional tort that is uninsurable under Ohio law?

"2. Does such a finding of bad faith with actual malice collaterally estop Buckeye from litigating this case?

"3. Under Ohio law does an exclusion in an insurance policy barring coverage for personal dishonesty, fraudulent breach of trust, intention to deceive, or intent to defraud embrace an insurer's bad faith with actual malice caused by its failure to settle a tort case?"

———————————

*Squire, Sanders & Dempsey, L.L.P.*, and *David J. Young; Chester, Wilcox & Saxbe, L.L.P.*, and John J. Chester, for respondent.

*Thompson, Hine & Flory, L.L.P.*, and *Bruce M. Allman; Louis G. Adolfsen* and *S. Dwight Stephens*, *pro hac vice*, for petitioner.

———————————

**PFEIFER, J.**

{¶ 12} We answer the certified questions thusly: (1) No, (2) No, and (3) We decline to answer.

*Question 1*

{¶ 13} "When an insurance company is found by Ohio courts to be guilty of 'bad faith' with 'actual malice' because it failed to settle a tort case against its insured, does such conduct constitute the type of intentional tort that is uninsurable under Ohio law?"

{¶ 14} We find that an insurer found to be guilty of bad faith with actual malice in failing to settle a tort case against its insured is not necessarily guilty of the type of intentional tort that is uninsurable under Ohio law.

{¶ 15} Not all intentional torts are uninsurable in Ohio. Ohio law, on public policy grounds, generally prohibits liability insurance from covering damage caused by intentional torts. *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 38, 665 N.E.2d 1115, 1118; *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 176, 551 N.E.2d 962, 965.

4

**{¶ 16}** But intentional acts sometimes lead to unintentional harms. In *Harasyn*, this court discussed the different levels of intent involved with intentional acts. "The first level, * * * 'direct intent,' is where the actor does something which brings about the exact result desired. In the second, the actor does something which he believes is substantially certain to cause a particular result, even if the actor does not desire that result." *Harasyn*, 49 Ohio St.3d at 175, 551 N.E.2d at 964. The court concluded that insurance coverage should be prohibited only for direct-intent torts.

**{¶ 17}** In *Physicians Ins. Co. of Ohio v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906, syllabus, this court held that "[i]n order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended." In *Swanson*, the insured fired a BB gun toward a group of children. While he intended to shoot the gun, he did not intend to hit any of the children. This court held that the insurer must provide coverage to the shooter for injuries one of the children suffered.

**{¶ 18}** Thus, an intent to injure, not merely an intentional act, is a necessary element to uninsurability. Whether the insured had the necessary intent to cause injury is a question of fact. *Swanson*, 58 Ohio St.3d at 193, 569 N.E.2d at 911. In very limited instances, this court has held that the intent to injure can be inferred as a matter of law under certain circumstances. In *Preferred Risk Ins. Co. v. Gill* (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118, intent to injure was inferred from the defendant's criminal conviction for aggravated murder, an essential element of which is that the perpetrator intended to cause the death. In *Gearing*, this court held that the intent to injure could be inferred from the insured's plea of guilty to charges involving the sexual molestation of minors. The court reasoned that the act and the harm are so intertwined in regard to molestation of children that to intend the act is also to intend the harm.

**{¶ 19}** In both of the above cases, insureds were found to have committed wrongful acts, acts that are intentionally injurious by definition. Here, Buckeye

claims to have intended to assert what it believed were its rights under an insurance contract. In certain circumstances, insurers are perfectly right to take such a stand. Murder and molestation do not enjoy similar sometime rectitude, and we therefore will not place failure to settle an insurance claim on their same plane. This court does not infer specific intent to injure from an act of contract interpretation.

{¶ 20} Therefore, in this case we apply the normal standard of determining intent to injure, a factual determination relating to this unique case. A jury has already spoken somewhat to Buckeye's conduct. Our duty is to determine whether the jury found that Buckeye had committed a direct-intent tort. New England argues that the jury expressed that finding in three ways: through the general verdict of bad faith, through its interrogatory answer regarding bad faith, and through its interrogatory answer regarding actual malice. We disagree.

{¶ 21} When the *Leber II* litigation commenced in 1987, the standard for bad-faith failure to settle an insurance claim was that contained in *Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45. The second paragraph of the syllabus in *Slater* set forth the standard:

"A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another."

{¶ 22} The jury instructions in *Leber II* contained the above language from the *Slater* syllabus. However, the instructions also contained language from *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, a case that applied a "reasonable justification" standard for bad-faith claims. This court in *Hoskins* stated that "when an insure[r] insists that it was justified in refusing to pay a claim of its insured because it believed there was no coverage of the claim, ' * * * such a belief may not be an arbitrary or capricious one. The

6

conduct of the insurer must be based on circumstances that furnish reasonable justification therefor.' " *Hoskins* at 277, 6 OBR at 341, 452 N.E.2d at 1320.  The above *Hoskins* language also appeared in the jury instruction on bad faith in *Leber II*.

**{¶ 23}** Intent as a necessary aspect of bad faith is missing from both *Hoskins* and *Slater*.  As this court stated in *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 554, 644 N.E.2d 397, 399, "the element of intent had been noticeably absent from this court's definition of when an insurer acts in bad faith" until this court's decision in *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 590 N.E.2d 1228.

**{¶ 24}** While the *Slater* language in the jury instruction does mention intent, it is not described as a necessary element of bad faith.  The *Hoskins* language is completely void of intent.  And in no case is the *intent to injure* an elemental part of bad faith.  Thus we do not determine that the jury found an intent to injure in arriving at its verdict of bad faith.

**{¶ 25}** The *Slater* language arises again in this case in jury Interrogatory No. 4.  The question mimics the *Slater* language from the jury instruction, and asks:

"Do you find, by a preponderance of the evidence, that the Buckeye Union Insurance Company's conduct at any time imported a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud or embracing actual intent to mislead or deceive another."

**{¶ 26}** The jury responded affirmatively to the interrogatory.  The jury did not break down all of the listed instances of what might constitute bad faith.  The only certainty we can derive from the response is that the jury found that Buckeye's conduct imported *one* of the following: (1) a dishonest purpose, (2) moral obliquity, (3) conscious wrongdoing, (4) breach of a known duty through some ulterior motive, or (5) ill will partaking of the nature of fraud or embracing actual intent to

mislead or deceive another. While intent may be assumed from any of the five instances of bad faith, only the fifth instance contains an element of intent *to injure*. For example, this court has stated that conscious wrongdoing "requires the party to possess knowledge of the harm that might be caused by his behavior." *Preston v. Murty* (1987), 32 Ohio St.3d 334, 335, 512 N.E.2d 1174, 1176. Knowledge of the harm that might befall another is entirely different from that harm being the motivating factor for one's behavior. We cannot assume from the jury's response that it found an intent by Buckeye to injure.

{¶ 27} Interrogatory No. 3 is also offered by New England as proof of Buckeye's direct intent. That interrogatory reads as follows:

"Do you find, by a preponderance of the evidence that the Buckeye Union Insurance Company's conduct in failing to settle the Leber's [*sic*] claims was motivated by actual malice."

{¶ 28} The jury responded "Yes." Again, we must look to the jury instructions and to case law to determine the significance of that response. The jury was instructed as follows:

"Malice in the law is the intentional or unlawful design to injure another without just cause or proof occasion [*sic*]. *The term malice not only includes an intentional act, an intent to cause harm to another party, but also encompasses conduct evidenced by callous and conscious disregard of the rights of another. Actual malice*, which is the basis upon which punitive damages may be awarded, *may be inferred from intentional acts which cause injury or damage to another.*

"Punitive damages may be awarded in a case involving bad faith claims against insurance companies upon proof of malice, fraud or insult by the insurance company. *Malice may also take the form of the defendant's expressed ill will, hatred or spirit of revenge or from willful or wanton behavior inferred from the conduct and the surrounding circumstances. * * *"* (Emphasis added.)

{¶ 29} A key statement in the jury instruction is that "[t]he term malice not only includes an intentional act, an intent to cause harm to another party, *but also encompasses conduct evidenced by callous and conscious disregard of the rights of another*." (Emphasis added.) That is an accurate statement of the law in Ohio. The syllabus in *Preston* holds that malice can be found where there is either conduct "characterized by hatred, ill will or a spirit of revenge, *or* * * * a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."

{¶ 30} The jury instruction sets forth several bases for a finding of actual malice: (1) callous and conscious disregard for the rights of others, (2) expressed ill will, hatred, or revenge, or (3) willful or wanton behavior. In regard to wanton conduct, this court has held that "[i]t is not necessary that an injury be intended or that there be any ill will on the part of the actor toward the person injured as a result of such conduct." *Tighe v. Diamond* (1948), 149 Ohio St. 520, 526, 37 O.O. 243, 246, 80 N.E.2d 122, 126.

{¶ 31} Moreover, the instruction stated that malice could be inferred from intentional acts that result in injury. As we have noted above, intentional acts that result in injury are not necessarily direct-intent torts, *i.e.*, torts committed with an intent to injure. Whether there was an intent to injure is the relevant inquiry, and it is an inquiry left unresolved by a finding of malice in this case.

{¶ 32} Clearly, the jury's finding of actual malice was presented within the context of whether Buckeye should be liable for punitive damages. "Actual malice is necessary for an award of punitive damages, but actual malice is not limited to cases where the defendant can be shown to have had an 'evil mind.' " *Cabe v. Lunich* (1994), 70 Ohio St.3d 598, 601, 640 N.E.2d 159, 162. We find that in deciding that Buckeye acted with actual malice the jury did not necessarily find that Buckeye acted with an "evil mind," *i.e.*, with an intent to injure.

**{¶ 33}** Since the jury did not specifically find that Buckeye acted with an intent to injure, Buckeye's bad-faith failure to settle the insurance claim was itself not necessarily an uninsurable act. New England's attempt to make bad faith and malice equal intent to injure is misplaced and also affects our resolution of the second question posed by the federal court.

*Question 2*

**{¶ 34}** "Does such a finding of bad faith with actual malice collaterally estop Buckeye from litigating this case?"

**{¶ 35}** We find that the jury's finding of bad faith with actual malice does not collaterally estop Buckeye from litigating this case. Our reasoning is similar to that in our response to the above question. New England is trying to expand the meaning of bad faith and actual malice to necessarily include the intent to injure.

**{¶ 36}** Due process requires a party asserting collateral estoppel to prove that the identical issue was (1) actually litigated, (2) directly determined, and (3) essential to the judgment handed down in the prior action. *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 201, 2 OBR 732, 739, 443 N.E.2d 978, 985.

**{¶ 37}** The issue to be litigated in this case is whether Buckeye acted with the direct intent to injure. The issue in this case is not whether Buckeye acted in bad faith and with actual malice such that it is liable for punitive damages. Thus, the issues litigated in the two cases are not identical. Certainly then, we cannot conclude that the issue of Buckeye's intent was directly determined.

**{¶ 38}** Also, the jury's finding of actual malice was not essential to the prior judgment. The jury's finding of bad faith was not dependent on a finding of malice. Malice was relevant only toward the issue of punitive damages, which the jury did not award. The jury's interrogatory response thus became irrelevant in *Leber II*. It was not a part of the judgment—the judgment against Buckeye would have been the same whether the question had been asked or not.

**{¶ 39}** Thus, we conclude that the jury's finding of bad faith with actual malice does not estop Buckeye from litigating this case.

*Question 3*

**{¶ 40}** "Under Ohio law does an exclusion in an insurance policy barring coverage for personal dishonesty, fraudulent breach of trust, intention to deceive, or intent to defraud embrace an insurer's bad faith with actual malice caused by its failure to settle a tort case?"

**{¶ 41}** We decline to answer the third certified question. It is a question properly resolved at the trial level.

*Judgment accordingly.*

MOYER, C.J., concurs.

COOK and LUNDBERG STRATTON, JJ., concur in judgment only.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur in part and dissent in part.

————————————

**COOK, J., concurring in judgment only.**

**{¶ 42}** I concur with the majority's outcome as to each of the three issues certified by the Sixth Circuit Court of Appeals. I write separately, however, because I disagree with the majority's analysis of each of the issues.

I

**{¶ 43}** Though the majority correctly resolves the first certified issue, I believe that its analysis misconstrues Ohio law by overlooking the standard set forth in *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 665 N.E.2d 1115.

A

**{¶ 44}** The Sixth Circuit has asked us to determine under current Ohio law whether an insured's bad-faith refusal to settle is the type of intentional tort that is excluded from insurance coverage under public policy. Rather than deciding this question under *Gearing*, this court's most recent pronouncement on the issue, the

majority returns to a standard set forth ten years ago in *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 551 N.E.2d 962. Such an approach incorrectly states the law and summarily erases the strides taken in *Gearing* towards a more reasonable and appropriate analysis of the insurability of intentional torts.

{¶ 45} My differences with the majority's analysis can best be understood by examining three decisions reached by this court over the last decade. The first is *Harasyn,* where the court announced a distinction between "direct-intent" torts and "substantial-certainty" torts for purposes of insurance coverage. To arrive at the distinction, the court first acknowledged the fundamental public policy principle that intentional torts are excluded from insurance coverage. Intentional torts, however, encompass "two different levels of intent." *Id.* at 175, 551 N.E.2d at 964. The first level, referred to as direct intent, "is where the actor does something which brings about the exact result desired. In the second level, the actor does something that he believes is substantially certain to cause a particular result, even if the actor does not desire that result." *Id*. Having clarified the two levels of intent, the *Harasyn* court concluded that public policy excludes from insurance coverage only direct-intent torts.

{¶ 46} Consideration of the intentional-tort issue continued in *Physicians Ins. Co. of Ohio v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906. There, the *Swanson* court concluded that an insured who fired at a group of people seventy feet away causing severe injuries, but who testified that he did not mean to hurt anyone, did not have the level of necessary intent to exclude his actions from coverage. Thus, *Swanson*, for the most part, continued the *Harasyn*-type analysis, requiring evidence of direct intent to injure before an act would be excluded from coverage. In its conclusion, however, the *Swanson* court opened the door for its upcoming decision in *Gearing*: "In this case the exclusion is inapplicable because the trial court's determination that Todd Baker's injury was not intentionally inflicted or *substantially certain to occur* is supported by competent, credible

evidence." *Id.* at 193-194, 569 N.E.2d at 911. Unlike *Harasyn*, *Swanson* implied that substantial-certainty torts *are* excluded from insurance coverage. Because actual application of this substantial-certainty prong of the test was missing from *Swanson*, however, we were left to assume that the facts in that case did not reach the substantial-certainty level.

{¶ 47} In our most recent case on this issue, *Gearing v. Nationwide Ins. Co.*, *supra*, we more fully developed the substantial-certainty suggestion contained in *Swanson*. In *Gearing*, we expanded the intentional-tort exclusion beyond direct-intent torts, outlining a two-part analysis. The first part, as in *Harasyn,* requires subjective consideration of the tortfeasor's direct intent. Where direct intent does not exist, however, the analysis proceeds to the second step, which considers objectively whether the tortfeasor's intentional act was substantially certain to cause injury. In such instances "determination of an insured's subjective intent, or lack of subjective intent, is not conclusive of the issue of coverage." *Id.*, 76 Ohio St.3d at 39, 665 N.E.2d at 1119. Rather, where substantial certainty exists, intent to harm will be inferred as a matter of law.

{¶ 48} As the last case decided on this issue, *Gearing* represents current Ohio law. But instead of following *Gearing*, the majority resurrects the *Harasyn* view that direct-intent torts are excluded from coverage while substantial-certainty torts are not. Apparently recognizing that this approach alone is insufficient, however, the majority augments it with a nebulously defined category of acts. This category covers acts that are "intentionally injurious by definition" and for which no direct intent is needed. While the majority's creation of this category is aimed at solving the shortcomings of the direct-intent approach, it produces instead an inherently ambiguous rule, as we are left to wonder precisely what this category contains. Indeed, the majority provides us with only two hints: (1) the category is very limited, and (2) it has been applied only to sexual molestation and murder.

**{¶ 49}** The majority then assigns *Gearing* to this category of acts, relegating it to nothing more than an anomaly limited in application to the sexual-molestation scenario. While *Gearing* was decided in the sexual-molestation context, its application is certainly not so limited. First, the *Gearing* court itself applied the "substantial-certainty" analysis to a context other than sexual molestation, as it discussed it in the context of the *Swanson* case. See *id.* at 39-40, 665 N.E.2d at 1119. Furthermore, one need only review the numerous post-*Gearing* appellate decisions to appreciate the precedential effect that courts have afforded that case. Ohio's appellate courts have repeatedly and without hesitation followed *Gearing* as an effective means of analyzing coverage issues regarding intentional torts.

**{¶ 50}** In *Snell v. Katafias* (Mar. 19, 1999), Montgomery App. No. 17440, unreported, 1999 WL 148229, for instance, the appellate court conducted a two-part analysis under *Gearing* of whether intentional infliction of emotional distress is excluded from insurance coverage. Determining first that the insured did not intend the injury, the court next asked whether the "injury resulting from an intentional infliction of emotional distress [was] objectively certain." *Id.* Concluding that it was and that the claim was not covered, the court reasoned: "At some point where harm appears to have been objectively certain, we no longer ask whether the insured subjectively intended the resulting harm." *Id.*

**{¶ 51}** Also relying on *Gearing*, the court in *Nationwide Mut. Ins. Co. v. Finkley* (1996), 112 Ohio App.3d 712, 715, 679 N.E.2d 1189, 1191, concluded that "where an insured willfully and purposefully attempts to elude the police in an automobile chase through an urban area in reckless disregard of traffic control devices, his actions are substantially certain to result in injury." Inferring intent to injure on that basis, the court reasoned that "[d]etermining that an individual could obtain insurance coverage for damages caused by intentional criminal activity, by willful flight from the police, flies in the face of * * * established public policy."

*Id.* at 716, 679 N.E.2d at 1191. Accordingly, the court held that the wrongful act was excluded from insurance coverage.

**{¶ 52}** The court in *Allstate Ins. Co. v. Ray* (Dec. 18, 1998), Mahoning App. No. 96CA20, unreported, 1998 WL 896366, also followed *Gearing* to conclude that a point-blank shooting was substantially certain to cause injury and therefore inferred intent to injure as a matter of law. Under the same reasoning, an insured's act of punching another individual in the face, although purportedly done without intent to injure, was also substantially certain to injure and therefore excluded from coverage. *Aguiar v. Tallman* (Mar. 15, 1999), Mahoning App. No. 97 C.A. 116, unreported, 1999 WL 148367. Similarly, intent to injure was inferred under *Gearing* to the act of chopping down a neighbor's trees, since that act was considered substantially certain to cause harm. *Cogar v. Commercial Union Ins. Co.* (Feb. 9, 1999), Medina App. No. 2816-M, unreported, 1999 WL 74620.

**{¶ 53}** Not only is *Gearing* the current state of the law in Ohio, but because it embodies an objective analysis, it also constitutes the better-reasoned approach. In fact, a significant number of jurisdictions across the country impose similar objective tests, rejecting the inadequacies of the subjective analysis. See, *e.g., Am. Bankers Ins. Co. of Florida v. Gilberts* (C.A.8, 1999), 181 F.3d 931, 932; *CNA Ins. Co. v. McGinnis* (1984), 282 Ark. 90, 666 S.W.2d 689; *Wright v. White Birch Park, Inc.* (1982), 118 Mich.App. 639, 325 N.W.2d 524. See, also, Annotation (1984), 31 A.L.R.4th 957. A Missouri appeals court, for instance, explained the superiority of the objective test in the following manner:

"Supplanting an objective standard with a subjective standard for determining whether the act or conduct of an insured is 'intentional' or 'expected or intended' for purposes of assessing coverage would emasculate apposite policy provisions by making it impossible to preclude coverage for intentional acts or conduct absent admissions by insureds of a specific intent to harm or injure. Human

nature augers against any viable expectation of such admissions." *Truck Ins. Exchange v. Pickering* (1982), 642 S.W.2d 113, 116.

{¶ 54} The inadequacy of a subjective standard such as the majority's becomes particularly clear when viewed in a *Swanson*-type context. In *Swanson,* the tortfeasor's act of shooting towards a group of bystanders was not excluded from coverage because he lacked intent to injure. While this result may be palatable where the insured shot from a distance of seventy feet, had the insured fired from only ten or even five feet away, causing the same injuries and also claiming the same lack of intent, certainly a different result should follow due to the foreseeability of the injury. But under the majority's approach, that shooting would not be excluded from coverage because the lack of direct intent to injure is all that precludes coverage. Nor would the shooting likely fall into the majority's "intentionally injurious by definition" category, as it involves neither murder nor sexual molestation.

{¶ 55} As we set forth in *Gearing*, "[l]iability insurance does not exist to relieve wrongdoers of liability for intentional, antisocial, criminal conduct." 76 Ohio St.3d at 38, 665 N.E.2d at 1118. Rather, insurance policies are purchased " 'as protection against calamity.' " *Transamerica Ins. Group v. Meere* (1984), 143 Ariz. 351, 355, 694 P.2d 181, 185, quoting *Noble v. Natl. Am. Life Ins. Co.* (1981), 128 Ariz. 188, 189, 624 P.2d 866, 867. Thus, "[t]he intentional exclusion is necessary to the insurer to enable it to set rates and supply coverage only if losses under policies are uncertain from the standpoint of any single policyholder, and if a single insured is allowed through intentional or reckless acts to consciously control risks covered by policy, the central concept of insurance is violated." 7A Appleman, Insurance Law and Practice (Rev.1979) 21, Section 4492.01. By permitting coverage of intentional acts that are substantially certain to occur, the majority places control of such risks squarely into the tortfeasor's hands.

**{¶ 56}** In sum, then, this court ought not to depart from *Gearing,* as the departure does nothing to clarify the analysis of this issue. Rather, it imposes an inadequate subjective test, coupled with an undefined category of inferred intent acts. More importantly, the majority's standard violates public policy by allowing coverage for wrongful acts that are substantially certain to cause injury.

B

**{¶ 57}** Though I disagree with the standard used by the majority to decide the first certified question, I do concur with the resolution it reaches. The majority correctly concludes that direct intent does not necessarily exist where a jury's verdict of bad-faith refusal to settle with actual malice is based upon the interrogatories and instructions involved here. While a jury's finding of actual malice may signal the existence of direct intent in various instances, when a jury's instructions imply that actual malice may be found on grounds other than intent, the jury's verdict does not necessarily include a finding of direct intent.

**{¶ 58}** Under *Gearing,* however, the analysis should not end there. Rather, we must ask whether as a matter of law we are to infer intent to injure from such a verdict. Both the bad-faith verdict and the actual-malice findings returned against Buckeye in *Leber II* concern Buckeye's subjective intent. Such intent, however, is irrelevant to the *Gearing* substantial-certainty determination. What is relevant is whether Buckeye's refusal to settle was substantially certain to injure the Lebers. Buckeye claimed that it had no duty to the Lebers because they were not insureds under the contract. Although reversed by this court, the appellate court agreed with Buckeye in *Leber II* and concluded that the Lebers were not covered under the policy and therefore had no claim against Buckeye. Because contracts are inherently subject to differing interpretations, I believe that a verdict of bad-faith refusal to settle with actual malice does not rise to the level of substantial certainty to injure under these circumstances.

**{¶ 59}** I would conclude, therefore, that a jury's verdict of bad-faith refusal to settle with actual malice does not evidence the type of intentional tort that is excluded from insurance coverage where the jury instructions and interrogatories do not clarify the requirement of intent to injure (*Harasyn*). Furthermore, such a verdict does not satisfy the objective portion of the intentional-tort inquiry, as the act of bad-faith refusal to settle is not necessarily, as a matter of law, substantially certain to injure (*Gearing*).

II

**{¶ 60}** I agree with the majority's conclusion that Buckeye is not collaterally estopped from litigating the issue of direct intent. Based upon the above rationale, however, I would also include within that analysis the issue of substantial certainty to injure. I do, however, disagree with the majority's discussion of the third prong of the *Goodson* collateral-estoppel test.

**{¶ 61}** In order to assert collateral estoppel, a party must prove that the identical issue was (1) actually litigated, (2) directly determined, and (3) essential to the judgment handed down in the prior action. *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 201, 2 OBR 732, 739, 443 N.E.2d 978, 985. The majority begins its analysis with the second prong of this test, and correctly decides that the issues here were not "directly determined." In so concluding, the majority emphasizes that the issues to be litigated here are not whether Buckeye acted in bad faith with actual malice. Rather, the relevant issue is whether Buckeye acted with direct intent (and I would include substantial certainty) to injure. Because these exact issues were not "directly determined," the *Goodson* standard is not met and Buckeye is not collaterally estopped from litigating these issues.

**{¶ 62}** Because one of the prongs has not been met, the analysis should end here. The majority, however, continues its consideration of the *Goodson* test, concluding that the third prong of *Goodson* was also not satisfied. In analyzing the third prong, however, the majority appears to confuse the relevant issues. While

the majority correctly emphasizes in its analysis of the second prong that the issues to be litigated *are not* bad faith with actual malice but instead direct intent, when analyzing the third prong it focuses upon actual malice as the issue to be litigated. Specifically, the majority concludes that the *actual-malice finding* was not essential to the judgment handed down in the prior action. Actual malice should play no part, however, in the analysis. Although this third prong does not need to be addressed, if it is, the question to be asked is whether the issues of *direct intent and substantial certainty* were essential to the judgment handed down in the prior action.

{¶ 63} Nonetheless, the majority reaches the correct resolution. Based upon that conclusion, I would hold that the issues of direct intent and substantial certainty to injure have not been directly determined in the prior action and therefore Buckeye is not collaterally estopped from litigating its case.

III

{¶ 64} While I agree with the majority's response to the third certified question, I believe that elaboration on the rationale supporting this determination would be of use. As the majority concluded, the issue of whether New England's policy excludes Buckeye's act of refusing to settle is an issue more appropriate for the trial court. This conclusion is proper because the verdict returned here is not, as a matter of law, the equivalent of the exclusion contained in the policy.

{¶ 65} The relevant exclusion in the New England policy provides:

"(a)    This Insurance shall not cover any Insured whose personal dishonesty, fraudulent breach of trust, or intention to deceive or defraud has been finally adjudicated or may be established."

{¶ 66} Neither the jury's verdict nor the accompanying interrogatories and instructions contained the language used in the exclusion. New England contends that the items contained in the exclusion and the jury's findings are essentially equivalent and therefore the claim should be excluded. Exclusion (a), however, is

ambiguous as to whether it excludes a claim for bad-faith refusal to settle with actual malice. The language of the exclusion does not mirror the elements of bad faith or actual malice, nor does it at any point mention them by name.

{¶ 67} It is axiomatic that where language in an insurance policy is susceptible of more than one meaning, the court will construe it liberally in favor of the insured and strictly as against the insurer. *Buckeye Union Ins. Co. v. Price* (1974), 39 Ohio St.2d 95, 99, 68 O.O.2d 56, 58, 313 N.E.2d 844, 846. Accordingly, if it was New England's intent to exclude bad-faith refusal to settle either with or without malice from its professional liability policy, it certainly could have used specific language to create such an exclusion.[1] Construing the ambiguous exclusion language against New England, then, I believe that the exclusion neither corresponds to the elements of bad-faith refusal to settle or to actual malice, nor does it specifically set forth such exclusions. Provision (a), therefore, does not, as a matter of law, exclude from coverage a claim based upon a judgment of bad-faith refusal to settle with actual malice.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

---

**Douglas, J., concurring in part and dissenting in part.**

{¶ 68} I concur only in the judgment of the majority with regard to the responses to questions one and two. I respectfully dissent from the judgment of the majority with regard to question three. I would answer question three and would answer it in the negative.

RESNICK and F.E. SWEENEY, JJ., concur in the foregoing opinion.

---

1. In fact, Buckeye's merit brief suggests that New England marketed the policy as specifically covering bad-faith claims. Furthermore, the policy explicitly covers punitive damages.