TALBERT, Appellant,

v.

CONTINENTAL CASUALTY COMPANY, Appellee.

[Cite as *Talbert v. Continental Cas. Co.*, 157 Ohio App.3d 469, 2004-Ohio-2608.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 20187.

Decided May 21, 2004.

470

Robert R. Furnier and Jeanette N. Dannenfelser, for appellant.

Stephen V. Freeze and Cinnamon S. Houston, for appellee.

FREDERICK N. YOUNG, Judge.

{¶ 1} Bruce Talbert appeals from the judgment of the Montgomery County Common Pleas Court, which granted summary judgment to Continental Casualty Company ("Continental") on Talbert's claims.

{¶ 2} In April 2000, Talbert was severely burned when he was injured at his workplace when someone began to operate a molding machine while Talbert was in its interior repairing the device. As a result of his injuries, Talbert filed a claim with workers' compensation and filed an intentional tort claim against his employer, Amcast. Talbert alleged that Amcast had required him to work on the molding machine without lockout/tagout protection despite knowledge that such a procedure was substantially certain to result in injury. Amcast had purchased an insurance policy with Continental to cover bodily injury claims that are not otherwise covered by workers' compensation. However, when Talbert sued Amcast for an intentional tort, Continental denied coverage, arguing that workplace intentional tort claims were not covered under the policy.

{¶ 3} A few weeks before trial, Talbert and Amcast reached a settlement through court-ordered mediation. Continental refused to participate in mediation, as it continued to deny coverage to Amcast for Talbert's injuries. As a part of the settlement, Amcast assigned to Talbert any of its claims against Continental. As a result of Amcast and Talbert's petitioning, the court entered a $1.295 million judgment in Talbert's favor against Amcast. Amcast and an excess insurer paid $295,000 of the judgment.

{¶ 4} In order to collect the remaining $1 million balance of the judgment, Talbert as Amcast's assignee filed a supplemental complaint, suing Continental for breach of contract, declaratory relief, and bad faith. Both parties filed cross-motions for summary judgment. Subsequently, the trial court issued its judgment denying Talbert's motion while granting Continental's motion for summary judgment, dismissing all claims against Continental. The basis for the trial court's conclusion was that Continental's policy covered only "accidents," which could never result from an intentional tort.

{¶ 5} Talbert has filed this appeal from the trial court's judgment, seeking a reversal of the trial court's judgment.

{¶ 6} While Talbert has not set out any formal assignments of error as required by the appellate rules, he essentially argues that the trial court erred in granting Continental's motion for summary judgment and denying his motion for summary judgment. Talbert asserts that the trial court's conclusion is in conflict with the Ohio Supreme Court's decision in *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 551 N.E.2d 962.

{¶ 7} Our review of the trial court's decision to grant summary judgment is de novo. See *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 65–66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 8} An insurance company owes no obligation to its insured or others injured by the insured unless the insured's conduct falls within the policy coverage. *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 36, 665 N.E.2d 1115. An act is covered by a policy if the act falls within the scope of coverage defined by the policy and is not excluded by an exception in the policy. Id. When interpreting an insurance contract, the main goal of the court is to achieve a " 'reasonable construction [of the contract] in conformity with the intention of the parties as gathered from the ordinary and commonly understood meaning of the language employed.' " *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 211, 519 N.E.2d 1380, quoting *Dealers Dairy Products Co. v. Royal Ins. Co.* (1960), 170 Ohio St. 336, 10 O.O.2d 424, 164 N.E.2d 745. If a contract's terms are clear and unambiguous, no issue of fact remains and the contract must be interpreted as a matter of law. *Inland Refuse Transfer Co. v.*

*Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271. However, when an ambiguity exists, the contract's ambiguous terms must be strictly construed against the insurer and liberally in favor of the policyholder. *King,* supra, 35 Ohio St.3d at 211, 519 N.E.2d 1380.

{¶ 9} When "construing an agreement, the court should prefer a meaning which gives it vitality rather than a meaning which renders its performance illegal or impossible." *Kebe v. Nutro Machinery Corp.* (1985), 30 Ohio App.3d 175, 30 OBR 316, 507 N.E.2d 369. Generally, "courts disfavor contract interpretations which render contracts illusory or unenforceable." *Harasyn v. Normandy Metals, Inc.* (July 28, 1988), Cuyahoga App. No. 53212, 1988 WL 86966, quoting *Liqui\*Lawn Corp. v. The Andersons* (Apr. 10, 1986), Cuyahoga App. No. 50240, 1986 WL 4394.

{¶ 10} We believe that a review of the case law surrounding intentional torts and insurance coverage is helpful in this case. In 1982, the Ohio Supreme Court originally held that employees could sue their employers for intentional torts. *Blankenship v. Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572. As a result of this change in the law, insurance policies covering injuries sustained in the scope and course of one's employment became very popular and were often referred to as stop-gap coverage. *Harasyn,* supra. Many employers bought insurance covering injuries sustained by employees during the course and scope of their employment in an attempt to protect themselves against employer intentional torts. *Miller v. Midwestern Indemn. Co.* (Feb. 23, 1996), Montgomery App. No. 15360, 1996 WL 397450.

{¶ 11} Subsequently, a dispute arose among the courts as to whether insuring against intentional torts was against Ohio's public policy. Initially, the Supreme Court found that insurance for intentional torts was against public policy. *Wedge Products Inc. v. Hartford Equity Sales Co.* (1987), 31 Ohio St.3d 65, 31 OBR 180, 509 N.E.2d 74. However, the Supreme Court addressed the issue again three years later in *Harasyn,* supra. In *Harasyn,* the Supreme Court found that a distinction existed between "direct intent" intentional torts and "substantially certain" intentional torts. Id. The court found that although it was against Ohio public policy to insure against "direct intent" torts, it was not against Ohio public policy to insure against "substantially certain" intentional torts. Id.

{¶ 12} After determining that insuring against "substantially certain" intentional torts is not against public policy, the Supreme Court addressed the particular policy in *Harasyn* to determine whether that policy covered "substantial certainty" intentional torts. Id. The *Harasyn* policy provided coverage for bodily injury caused by an "occurrence," which was defined as an "accident." Id. Although an "accident" had previously been defined in case law as an "occurrence" that is not intended or expected, the Supreme Court found that employer intentional torts

were covered by the policy. Id. In reaching its conclusion, the majority in *Harasyn* expressed the concern that "if such coverage is excluded, the insured is left with essentially no coverage in return for the premiums paid to secure the supplemental endorsement." Id.

{¶ 13} The Supreme Court addressed the issue again in *Physicians Ins. Co. of Ohio v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906. In *Swanson,* the homeowner's insurance policy excluded insurance coverage for bodily injury that was expected or intended by the insured or personal injury that was caused intentionally. Id. The *Swanson* court determined that intended or expected injuries are excluded by these provisions only if the damage that in fact occurred was intended by the insured. Id. (noting a Massachusetts court case that held that to be excluded the insured must specifically intend the harm or be substantially certain such harm would occur).

{¶ 14} In February 1996, this court addressed an employer's liability coverage endorsement in *Miller,* supra. In *Miller,* this court examined a commercial general liability policy issued to an employer with an employers' liability coverage endorsement. Id. Although the policy contained an exclusion for injuries that were intended or expected and injuries suffered in the course and scope of one's employment, the endorsement did not reiterate these exclusions. Id. However, the endorsement did provide a statement that "nothing herein shall be construed to provide insurance for the payment of damages for such intentional torts." Id. In *Miller,* the company had paid a separate premium for the endorsement separate from the general policy. Id. This court determined that *Swanson* was controlling on the issue of intended or expected injuries exclusions, specifically that the exclusion does not apply unless it is proved that the insured intended the injury. Id.

{¶ 15} Subsequently, the Supreme Court issued another decision on the issue in *Gearing,* supra. *Gearing* involved a homeowner's insurance policy belonging to a homeowner who sexually molested three of his neighbor's daughters. Id. The homeowner sought a declaration that his homeowner's insurance carrier was obligated to defend him in the civil suit brought by the neighbors that he molested. Id. The homeowner admitted that he had sexually molested the girls but claimed that although he knew the activity was morally wrong, he did not know that he was causing emotional and mental harm to the girls. Id. Thus, he argues that he did not intend to injure the girls. Id.

{¶ 16} The *Gearing* policy stated that the insurance company would pay the damages that the insured homeowner was obligated to pay due to an "occurrence," which was defined in the policy as an "accident." Id. Moreover, the policy contained an exclusion for an "intentional injury" that excluded coverage for injury that was "expected or intended by the insured." Id.

{¶ 17} The Supreme Court determined that the homeowner's intentional acts of molestation did not amount to "occurrences" under the policy because the intent to harm could properly be inferred from deliberate acts of sexual molestation. Id. In reaching this conclusion, the court reviewed other courts' decisions on sexual molestation cases and found that "[a]ssertions by insured adults that they did not intend the harm resulting from their intentional sexual misconduct with minors have been described as 'def[ying] logic,' * * * 'little short of absurd,' * * * and 'fl[ying] in the face of all reason, common sense and experience' * * *." Id., quoting *Wiley v. State Farm Fire & Cas. Co.* (C.A.3, 1993), 995 F.2d 457, 463. Thus, the court determined that it is appropriate to infer an intent to harm as a matter of law from deliberate acts of sexual molestation of a child. Id. Yet, rather than applying this reasoning to the exclusion for intentional torts, the court applied the inferred intent rule to determine that the sexual molestation did not amount to an "occurrence," which the policy defined as an "accident." Id. The court continued on to reiterate its approval in *Swanson* of the premise that " 'resulting injury which ensues from the volitional act of an insured is still an "accident" within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur.' " Id., quoting *Swanson,* supra.

{¶ 18} Thus, the Supreme Court had appeared to have changed its stance on intentional tort coverage in insurance policies after *Gearing,* moving away from *Harasyn,* supra. However, in 1997 after *Gearing,* the Supreme Court, which had accepted an appeal of this court's decision in *Miller,* supra, as in conflict with another appellate court, dismissed the appeal and reiterated that the controlling law was stated in *Harasyn,* supra. *Miller v. Midwestern Indemn. Co.* (1997), 77 Ohio St.3d 1261, 674 N.E.2d 367. Therefore, it was unclear whether *Harasyn* was still the controlling law on the issue of intentional torts.

{¶ 19} The Supreme Court again addressed the insurance for intentional torts issue in *Buckeye Union Ins. Co. v. New England Ins. Co.* (1999), 87 Ohio St.3d 280, 720 N.E.2d 495. In *Buckeye,* the policy at issue was a professional liability insurance policy that Buckeye had purchased from New England Insurance Company. Id. Buckeye had been determined by the courts to be liable on a claim for bad-faith refusal to settle and sought reimbursement from New England under the professional liability policy in federal court. Id. As a result of this litigation, the Sixth Circuit Court of Appeals certified several questions to the Ohio Supreme Court. Id.

{¶ 20} In *Buckeye,* the Supreme Court reiterated the court's holdings in *Harasyn* and *Swanson,* stating that "an intent to injure, not merely an intentional act, is a necessary element to uninsurability." Id., 87 Ohio St.3d at 283, 720 N.E.2d 495. The court again discussed the distinction created in *Harasyn* that

direct intent torts are excluded from coverage while substantial certainty torts are not excluded. Id. The court continued on to state that generally, the issue of whether the insured had the intent to cause injury is a question of fact. Id. However, the court cautioned that it had determined that in very limited instances the intent to injure can be inferred under certain circumstances. Id. Specifically, the court had found that in situations of aggravated murder or sexual molestation of a minor, the intent to injure could be inferred as a matter of law as these acts were "intentionally injurious by definition." Id., 87 Ohio St.3d at 283–284, 720 N.E.2d 495, citing *Preferred Risk Ins. Co. v. Gill* (1987), 30 Ohio St.3d 108, 30 OBR 424, 507 N.E.2d 1118; and *Gearing,* supra.

{¶ 21} The court's *Buckeye* decision and Justice Cook's separate concurrence demonstrated a debate within the court concerning the current law on whether "substantial certainty" torts are excluded from insurance coverage pursuant to Ohio public policy. *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 738 N.E.2d 1243, citing *Buckeye,* supra (Cook, J., concurring separately). In Justice Cook's concurrence in *Buckeye,* she opined that the objective standard of inferring intent when the harm was substantially certain to occur that was described in *Gearing* was superior to the subjective "direct intent" standard described in *Harasyn* and *Swanson* that the majority relied on in *Buckeye. Buckeye,* supra.

{¶ 22} More recently, the Supreme Court again examined the issue of whether substantially certain intentional torts are barred by exclusions in insurance policies or Ohio public policy in *Penn Traffic Co. v. AIU Ins. Co.,* 99 Ohio St.3d 227, 2003-Ohio-3373, 790 N.E.2d 1199. *Penn Traffic* involved an injury to an employee arising out of a substantial certainty intentional tort and whether this was covered by either of two separate insurance policies that had been issued to the employer. Id. One of the insurance policies was a commercial general liability policy that contained a coverage enhancement endorsement. Id. In addition to the commercial general liability policy containing an exclusion for injury to employees arising out of or in the course of employment, the endorsement excluded coverage for injury "expected or intended from the standpoint of the insured," specifically excluding "any liability for acts committed by or at the direction of an insured in which the act is substantially certain to cause 'bodily injury.'" Id. The court read the endorsement in conjunction with the commercial general liability policy provisions. Id. Pointing to the commercial general liability policy provision that excluded injuries arising out of the course of employment, the court determined that the policy did not provide coverage for an employer's liability for substantial certainty intentional torts. Id. However, we note that the insured in *Penn Traffic* did not argue that the endorsement was illusory and the opinion does not indicate whether a separate premium was charged for the endorsement. Id.

{¶ 23} Additionally, the second insurance policy at issue in *Penn Traffic* was an excess umbrella policy that provided the injury had to be caused by an "occurrence," which the policy defined as "an event, including continuous and repeated exposure to substantially the same general harmful conditions neither expected nor intended from the standpoint of the insured." Id. The Supreme Court held that a genuine issue of material fact remained as to whether the substantial certainty intentional tort was covered by the umbrella policy. Id.

{¶ 24} At approximately the same time as *Penn Traffic*, the Supreme Court had accepted an appeal of an Eighth District decision in *Sifco Indus., Inc. v. Safety Natl. Cas. Corp.*, Cuyahoga App. No. 81202, 2002-Ohio-6511, 2002 WL 31667851. In *Sifco*, the Eighth District examined a workers' compensation and employers' liability insurance agreement that had been issued by Safety National to Sifco, an employer that had an employee who suffered a work-related amputation. Id. The policy in *Sifco* provided coverage for "bodily injury" arising out of an "occurrence," which the policy defined as an "accident." Id. The policy did not continue on to specifically define an "accident." Id. The *Sifco* court determined that an accident "may mean something which was not expected or intended, it does not inherently include the qualification 'from the standpoint of the insured.'" Id. at ¶ 22. Thus, the *Sifco* court determined that a substantial certainty intentional tort can be an "accident." Id. Additionally, the policy in *Sifco* contained an exclusion for intentional acts of the employer that resulted in injury. Id. The *Sifco* court found that without an express exclusion of substantial-certainty intentional torts, they are not excluded by a general exclusion for injury caused by intentional acts. Id.

{¶ 25} Although *Penn Traffic* may have called into question the Eighth District's decision in *Sifco*, the Supreme Court after its decision in *Penn Traffic* determined that the appeal to the Supreme Court of *Sifco* had been improvidently granted and dismissed the appeal. *Sifco Indus. Inc. v. Safety Natl. Cas. Corp.*, 99 Ohio St.3d 302, 2003-Ohio-3630, 791 N.E.2d 458. Despite a motion for reconsideration of this decision, the Supreme Court has continued to refuse to hear an appeal of the *Sifco* decision. *Sifco Indus. Inc. v. Safety Natl. Cas. Corp.*, 99 Ohio St.3d 1548, 2003-Ohio-4671, 795 N.E.2d 685.

{¶ 26} Having reviewed the case law on the issue, we now turn to the policy at issue in this case. Amcast purchased a specific excess workers' compensation and employer's liability policy. Under the coverage section of the policy, it contained the following provision:

{¶ 27} "EMPLOYERS LIABILITY INDEMNITY COVERAGE. The Company will indemnify the Insured for loss resulting from an occurrence during the Policy Period because of the Insured's legal liability for damages arising out of bodily injury or occupational disease sustained by employees normally employed

in a state named in ITEM 3 of the Declarations. This Policy shall not indemnify the Insured for loss:

{¶ 28} "(1) for any amount exceeding that which the Insured would have sustained had the Insured not rejected the Workers Compensation Act of any state named in ITEM 3 of the Declarations, or any part of such act; or

{¶ 29} "* * *."

{¶ 30} The "DEFINITIONS" section of the policy defined an "occurrence" as an "accident." The policy did not define the term "accident." Additionally, the "EXCLUSIONS" section of the policy contained the following provision:

{¶ 31} "This policy shall not apply

{¶ 32} "* * *

{¶ 33} "(c) additionally under Employers Liability Indemnity Coverage in PART 1 of the Policy: * * *

{¶ 34} "(3) to bodily injury intentionally caused or aggravated by or at the direction of the Insured."

{¶ 35} Continental argues that we should uphold the trial court's grant of summary judgment because Talbert's injury was as a result of a substantial-certainty intentional tort, which Continental asserts cannot be an "occurrence" as defined as an "accident." In support of its argument, Continental points to the Supreme Court's decision in *Gearing,* supra.

{¶ 36} However, we are struck by the fact that if Continental's interpretation is correct, Amcast would have purchased nothing when it purchased this policy from Continental. Unlike *Gearing, Penn Traffic, Swanson,* or *Preferred Risk,* the policy at issue in this case was not a general homeowner's policy or a commercial general liability policy wherein an insured was arguing for coverage based on just one provision in an otherwise comprehensive policy. The only thing that the Continental insurance policy asserts to cover is those injuries to Amcast's employees arising out of their employment with Amcast that is not covered by the workers' compensation system. In Ohio, the only injuries that would not be covered by workers' compensation are intentional torts and, pursuant to *Harasyn,* the only intentional tort that one can insure against without violating Ohio public policy is substantial-certainty intentional torts. Thus, the only thing the Continental policy would provide coverage for was substantial-certainty intentional torts. Yet, Continental now argues that even these are not covered under its policy. The only thing Continental argues that would be covered under the policy is "dual capacity torts." However, the *Harasyn* court addressed this argument and found it to be specious. *Harasyn,* supra. We find that Continental's argument would render its policy illusory. Like the courts in *Harasyn* and

*Miller*, we are not inclined to give the insurance policy a reading that would render it useless. Amcast paid a significant premium for this policy, and we fail to see what it paid for if it was not coverage for substantial-certainty intentional torts. Therefore, we do not find Continental's argument persuasive.

{¶ 37} We find this case more similar to *Harasyn, Miller*, and *Sifco*, which were examining insurance policies or endorsements specifically designed as excess coverage for workers' compensation. Webster's New College Dictionary defines an "accident" as "an unexpected or undesirable event." However, as the *Sifco* court reasoned, there is nothing in the policy stating that this event had to be unexpected from the standpoint of the insured. Certainly the event resulting in Talbert's severe injuries was both unexpected and undesirable from Talbert's perspective even if Amcast knew that the injury was substantially certain to occur. We find that the term "accident" is ambiguous and thus should be interpreted in favor of the insured, Amcast. Similarly in *Harasyn, Miller*, and *Sifco*, a substantial-certainty intentional tort was not held to be excluded under the insurance policy because the policy covered only "occurrences" defined as "accidents." Therefore, we do not agree with the trial court that the substantial-certainty tort that injured Talbert could not amount to an "occurrence" under the policy. Thus, the grant of summary judgment to Continental based on this provision was in error.

{¶ 38} Continental additionally argues that Talbert's injury is not covered by the policy because of the policy's exclusion for "bodily injury intentionally caused" by the insured. We note initially that unlike many of the policies in the above-discussed cases, Continental's policy excluded coverage only for injuries intended by the insured rather than injuries that were "Intended or Expected by the Insured" as in *Swanson, Miller, Gearing*, and *Penn Traffic*. The justification for finding that a substantial-certainty tort is barred by this exclusion is even weaker than the exclusions in *Swanson, Miller, Gearing*, and *Penn Traffic* that also excluded "expected" injuries. As the Supreme Court stated in *Buckeye*, in order for an intentional-tort exclusion to apply, it must be shown that the injury or harm was intended by the insured. In *Buckeye*, the Supreme Court explained that *Gearing* was a limited factual-specific case dealing with sexual molestation wherein the court could infer an intent to harm from the criminal act. The facts underlying this action do not amount to a situation like *Gearing* wherein we can infer intent to cause harm to Talbert. Rather, this case is similar to *Harasyn, Miller*, and *Sifco* in that the exclusion for intentional injuries does not bar the substantially certain tort underlying this action. Thus, Continental is not entitled to summary judgment based on the exclusion for injuries intentionally caused.

{¶ 39} Finally, Continental argues that Amcast has not yet reached its self-retention limit and therefore Continental is not yet liable. Under the policy,

Amcast had a self-retention limit of $500,000 that had to be exhausted prior to Continental's obligation to pay. Continental argues that Talbert seeks to combine the amounts Amcast expended in the workers' compensation and the intentional-tort litigation arising from this incident in order to reach the self-retention limit but that this is contrary to the policy provisions.

{¶ 40} When determining issues of insurance coverage, "it is beyond question that any ambiguity will be resolved in favor of the insured and against the insurer." *Thompson v. Preferred Risk Mut. Ins. Co.* (1987), 32 Ohio St.3d 340, 342, 513 N.E.2d 733. Ambiguity will be found when a term impacting a policy's coverage is reasonably susceptible of more than one meaning. *King,* supra.

{¶ 41} The policy Continental issued to Amcast contained a "CLAIMS EXPENSE AMENDATORY ENDORSEMENT," which provided:

{¶ 42} "PART 2 RETENTION AND LIMIT OF INDEMNITY, shall be replaced with the following: No indemnity shall be afforded under this Policy, unless and until the Insured shall have sustained loss and claim expense as a result of each occurrence in excess of the amount of the Retention state in ITEM 5 for the types of coverage involved in the Declarations. The Company hereby agrees to indemnify the Insured against loss and claim expense as a result of each occurrence in excess of such Retention, subject to the Limit of Indemnity provided for in ITEM 4 for the types of coverage involved in the Declarations."

{¶ 43} The endorsement additionally changed the definition of "loss" to mean "only such amounts as are actually paid by the Insured in payment of benefits under the applicable Workers Compensation Act, (or in settlement of its Employers Liability insured hereunder) in settlement of claims, or in satisfaction of awards or judgments. However, the term 'loss' shall not include salaries paid to employees of the Insured, nor fees and retainers paid to the Insured's service organization."

{¶ 44} In another separate endorsement that was titled "SPLIT SELF-INSURED RETENTION ENDORSEMENT," the policy was amended such that under the heading "Insured's Specific Retention Each Occurrence" for Ohio was listed $500,000.

{¶ 45} Continental points to the endorsement's definition of "loss" as amounts paid by the insured "in payment of benefits under the applicable Worker's Compensation Act, (*or* in settlement of its employers liability insured hereunder)" as requiring that Amcast exhaust a $500,000 retention for both workers' compensation claims and again for employer's liability claims even if both claims arise out of the same occurrence. Although the policy does not list a separate retention amount for workers' compensation and for employer liability, Continental argues

that because they are two separate coverages under the policy, the retention amount has to be exhausted for each type of coverage.

{¶ 46} Talbert points to the fact that the language of the policy credits Amcast's loss or claims expense payments toward the retention limit "*based upon each occurrence.*" Talbert further argues that Item 4 of the Declarations sets separate limits of indemnity for the workers' compensation claims and the employer's liability claims for each occurrence, which is then clarified in endorsement 2 to mean that Continental's maximum limit of indemnity per occurrence is $1,000,000. Thus, Talbert argues that Continental could have listed separate self-insured retention amounts for workers' compensation and employer's liability but did not do so. Further, even though there is separate coverage for workers' compensation and employer's liability, Continental's indemnity exposure is still limited to a maximum of only $1,000,000 regardless of whether that amount is paid for workers' compensation coverage or employer's liability coverage.

{¶ 47} Therefore, we find that the Continental policy's definition of loss per occurrence as amounts "paid by the Insured in payment of benefits under the applicable Workers Compensation Act, (or in settlement of its Employer's Liability insured hereunder) in settlement of claims, or in satisfaction of awards or judgments," is at least reasonably susceptible of being interpreted as one self-insured retention amount per occurrence regardless of whether the amounts are paid for workers' compensation or employer's liability. Thus, the policy is ambiguous and should be interpreted in favor of the insured, Amcast.

{¶ 48} Therefore, we disagree with Continental's argument that Amcast failed to exhaust its self-insured retention. Talbert submitted as evidence at the trial level an affidavit of Amcast's general counsel that Amcast had paid more than $500,000 combined to settle and to defend the workers' compensation and intentional-tort claims that arose from Talbert's accident. As Continental is not disputing the veracity of this statement, we will accept it as true and, based on our interpretation of the policy, Amcast has exhausted its self-insured retention amount. Continental's argument to the contrary is without merit.

{¶ 49} Having reviewed the evidence and case law in this case, we conclude that Talbert's appeal has merit. Thus, the trial court's judgment granting Continental's motion for summary judgment is reversed, and the matter is remanded for the court to enter a judgment granting Talbert's motion for summary judgment.

Judgment reversed<br>and cause remanded.

BROGAN and GRADY, JJ., concur.