The BUCKEYE RANCH, INC., Plaintiff,

v.

NORTHFIELD INSURANCE CO. et al., Defendants.

2005-Ohio-5316.]

Court of Common Pleas of Ohio,
Franklin County.

No. 04CVH–07–7914.

Decided Sept. 30, 2005.

12

**14**

Vorys, Sater, Seymour & Pease L.L.P., William J. Pohlman, and Lisa Pierce Reisz, for plaintiff.

Roetzel & Andress and Bradley L. Snyder, for defendant Hylant MacLean of Columbus, Inc.

Ulmer & Berne L.L.P., Harold Reader, and David L. Eidelberg, for defendant Northfield Insurance Company.

FRYE, Judge.

## I. Introduction

{¶ 1} This case primarily concerns the meaning of an insurance-policy exclusion incorporating, in substance, the "known loss" doctrine. In 1996, one boy sexually assaulted his younger roommate while both were long-term residents receiving treatment at The Buckeye Ranch, Inc. ("the Ranch"). The Ranch is a nonprofit institution that provides services, including a residential program, for children and families struggling with emotional, behavioral, and mental health issues. It had liability insurance coverage in force during 1996, written on a "claims-made" basis. Three years later, the Ranch changed to a traditional occurrence-based format for its insurance. Seeking to assure that there was no inadvertent gap in coverage, the Ranch consulted a broker. It then purchased a prior acts coverage endorsement from Northfield Insurance in exchange for an additional premium of $13,600. Several years later, roughly six years after the assault, the victim first presented a multimillion-dollar tort claim against the Ranch. Northfield Insurance denied coverage under the prior acts endorsement, and the Ranch thereafter settled the boy's claim. This coverage lawsuit followed.

## II. The Factual Setting

### 1. The Parties

{¶ 2} As documented in a stipulation of facts relative to Counts 1 and 2,[1] the Ranch is an Ohio not-for-profit corporation operating a facility offering "treat-

---

1. The stipulation is thorough and, together with the affidavits of two witnesses, avoided any dispute over fact material to this opinion. The court commends counsel for their care in

ment for at-risk children and adolescents." Defendant Hylant MacLean is an independent insurance agency in the Columbus area. MacLean serviced the Ranch's insurance needs. Defendant Northfield Insurance Co. is an insurer licensed in Ohio.

{¶ 3} At all times relevant to this case, the Ranch carried both commercial general liability ("CGL") and professional liability ("PL") coverages. Between March 1996 and March 1999, successive annual claims-made CGL and PL coverage was purchased from Scottsdale Insurance Co. Effective January 1, 1999, the Ranch switched insurers to Northfield. It also changed the type of CGL and PL coverages from claims-made to occurrence-based. Five months after Northfield bound coverage under Policy No. KA 990011, the Ranch completed an application for the new carrier.

{¶ 4} Northfield Insurance knew it was binding coverage on a business dealing with "adolescent counseling, rehabilitation and support groups" and that the Ranch was a "Behavioral Healthcare Facility." The new policy included several endorsements, the third of which was a one-page prior-acts coverage endorsement. That endorsement was governed by the general terms of Northfield's Policy. Paragraph 15 of the parties' stipulation states that the endorsement modified both the CGL and the PL coverages. The prior-acts coverage endorsement was purchased for an additional premium of $13,600. Northfield continued to insure the Ranch for a number of years after 1999.

### 2. The 1996 Incident

{¶ 5} Andrew C. was 9 years old when he was sexually assaulted in the fall of 1996. The perpetrator was another resident of the Ranch, a 14–year–old boy named David M. The Ranch assigned Andrew C. as David M.'s roommate. For brevity, this tragic event is referenced as the "incident."

{¶ 6} Paragraph 19 of the parties' stipulation records that the Ranch "was aware" of the incident in 1996. The Ranch conducted its own internal review, and the incident was fully investigated by local police and Franklin County Children Services. In fact, David M. admitted the assault to Ranch staff three weeks after it occurred. The Ranch prepared two incident reports and cooperated with the criminal investigation leading to David M.'s conviction in juvenile court. Franklin County Children Services apparently initially found allegations of neglect attributable to the Ranch itself, but following an appeal, all specific allegations against the Ranch were withdrawn and/or vacated.

---

drawing together the factual record in this manner, which assisted this court, and makes the factual background readily understandable for appellate review.

{¶ 7} No civil claim was made, formally or informally, on behalf of Andrew C. for nearly six years following the incident. Andrew C. remained in treatment at the Ranch until August 1997, when his family relocated to Georgia. Neither he nor his family ever complained during that time about the Ranch's responsibility for the incident or his treatment. No one suggested that a legal claim would be brought. In July 2002, however, an attorney sent a demand letter to the Ranch. Once that claim was presented, the Ranch retained counsel and submitted Andrew C.'s claim to MacLean and Northfield. Neither MacLean nor Northfield was aware of the incident prior to that time. By letter dated October 15, 2002, Northfield denied any obligation for Andrew C.'s claim and refused to defend the Ranch against it. Andrew C. never filed suit. He did pursue what was, apparently, a multimillion-dollar claim. Following negotiations, that claim was settled in September 2003 with the approval of a probate court in Georgia.

{¶ 8} Before the court are cross-motions for summary judgment filed by the Ranch and Northfield. The Ranch moved for partial summary judgment on counts one and two of the complaint. Count one sought a declaratory judgment that Northfield was obligated to defend the Ranch and indemnify it for defense costs and settlement expense. Count two was a claim for breach of contract alleging that the Ranch satisfied all preconditions for coverage.

### 3. The Prior–Acts–Coverage Endorsement

{¶ 9} On January 28, 1999, Northfield issued liability insurance for the Ranch, retroactive to the first day of January. It is undisputed that from 1993 until 1999, the Ranch had maintained claims-made liability insurance with Scottsdale. The policy issued by Northfield was an occurrence-based policy. Both Northfield and the Ranch used insurance brokers as intermediaries to negotiate new coverage for the Ranch, according to the affidavit of Northfield's underwriter. The Ranch used MacLean; Northfield worked directly with Westrope & Associates.

{¶ 10} Occurrence-based policies and claims-made policies are materially different. A claims-made policy provides protection when claims are brought against an insured during the life of the policy, while an occurrence-based policy provides coverage when allegedly wrongful acts occur during the policy period without regard to when a claim is presented or a suit is filed. See *Mueller v. Taylor Rental Ctr.* (1995), 106 Ohio App.3d 806, 810–11, 667 N.E.2d 427, citing *United States v. A.C. Strip* (C.A.6, 1989), 868 F.2d 181. Claims-made policies were developed in an attempt by the insurance industry to simplify underwriting and the setting of reserves. See *Montrose Chem. Corp. v. Admiral Ins. Co.* (1995), 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 903, fn. 24.

██ {¶ 11} Due to the conceptual difference in coverage, an insured switching from a claims-made to an occurrence-based policy can experience a gap in protection. As fully explained in the stipulation of the parties, such a gap may arise if a third-party claim is first made after a claims-made policy has expired, but arises from an event that occurred before the new occurrence-based policy took effect. To bridge this potential gap, so-called "tail" and "nose" coverages may be purchased. "Tail" coverage is generally purchased from the expiring claims-made insurer. Tail coverage has been known in the industry for several decades and is intended to allow a policyholder to report third-party claims that arise after the claims-made policy expires. See also, *Pemco, Inc. v. Tiarks* (July 28, 1977), Cuyahoga App. No. 36285, 1977 WL 201475 (upholding claims-made policies against the contention they should be void as against public policy because "tail" coverage is available to assure continuing protection). So-called "nose" coverage is usually purchased from the new occurrence-based insurer. It treats prior acts as "occurrences" within the new policy period. Thus, Northfield's prior-acts coverage endorsement purports to provide protection against "damages for covered 'bodily injury' or 'property damage' that have been deemed to have occurred during the policy period between 03/05/1993 and 01/01/1999."

## III. Analysis

### 1. General Rules for Policy Interpretation in Ohio

██ {¶ 12} Under Ohio law, the interpretation of an insurance contract is, ordinarily, a question of law to be decided by the court. *Costanzo v. Nationwide Mut. Ins. Co.*, 161 Ohio App.3d 759, 2005-Ohio-3170, 832 N.E.2d 71, at ¶ 19; *Gaffney v. Powell* (1995), 107 Ohio App.3d 315, 319, 668 N.E.2d 951. The role of a court is to determine the intentions of the parties and to construe the contract in a manner that effectuates that intent. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 273, 714 N.E.2d 898; *Costanzo*, supra, at ¶ 20. If the language is unclear, then circumstances surrounding an agreement may be considered to the extent they "invest the language of the contract with a special meaning ... in an effort to give effect to the parties' intentions." Id.

██ {¶ 13} A contract of insurance is to be construed liberally in favor of the insured and strictly against the insurer when the meaning of the language used is uncertain. *Faruque v. Provident Life & Acc. Ins. Co.* (1987), 31 Ohio St.3d 34, 31 OBR 83, 508 N.E.2d 949, syllabus; *Moorman v. Prudential Ins. Co.* (1983), 4 Ohio St.3d 20, 22, 4 OBR 17, 445 N.E.2d 1122. A corollary rule long recognized in Ohio is that in reading exclusions from coverage, any exceptions, qualifications, or exemptions from coverage otherwise provided are to be read narrowly, having in mind the presumption that coverage not clearly excluded remains available to a policyholder. *Moorman*, supra, citing *Home Indemn. Co. v. Plymouth* (1945),

146 Ohio St. 96, 32 O.O. 30, 64 N.E.2d 248, paragraph two of the syllabus. The Sixth Circuit understands Ohio law to be that "any reasonable interpretation of an insurance policy that results in coverage for the insured must be adopted." [Citation omitted.] *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.* (C.A.6, 1995), 51 F.3d 1277, 1280.

### 2. The Prior–Acts Coverage Endorsement

{¶ 14} Northfield issued "nose" coverage for prior acts. There are two pertinent provisions in the endorsement to Northfield's policy addressing prior acts. One states the preconditions to prior-acts coverage, and the second excludes coverage under certain circumstances. The language reads:

> In consideration of the additional premium charged, it is agreed that this insurance shall also apply to damages for covered "bodily injury" or "property damage" that:
>
> — have been deemed to have occurred during the policy period between 03/05/1993 and 01/01/1999;
> — were caused by an "occurrence" as defined within the policy;
> — weren't known by you or any insured prior to 01/01/1999;
> — are not covered by the prior claims made policies;
> — arise from a claim or suit made or brought subsequent to 01/01/1999.
>
> This insurance provided by this endorsement does not apply to any damages arising out of any act, error, omission or prior litigation which is known by the Insured as of the inception date of this policy.

{¶ 15} The parties recognize that the prior-acts coverage endorsement is at the core of this case. That additional coverage was negotiated by experts to fill a specific need. Northfield's underwriter testified by affidavit, "At no time prior to issuance did we have direct contact with The Ranch." However, coverage was examined and agreed upon through two insurance brokers, and Northfield specifically tailored the prior-acts endorsement to the needs of the Ranch. Thus, the earlier claims-made coverage from Scottsdale was implicitly referenced in the endorsement, which provided protection against prior acts resulting in bodily injury so long as (1) the damages occurred between March 1993 and January 1999—that is, during the Scottsdale claims-made period, (2) the damages were caused by an "occurrence" as defined in the new policy,[2] (3) the damages "weren't known by the Ranch" prior to January 1, 1999, (4) the damages were not covered

---

2. Although the word "occurrence" is used in quotation marks in the endorsement, that term was not defined in it. However, at page 9 (of 10) in the CGL, "occurrence" is defined in the customary way used in such policies, as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

by the prior claims-made policy, and (5) the damages arose from a claim or suit made after January 1, 1999.

{¶ 16} Supplementing the third of these five requirements for coverage (that any damages "weren't known" to the Ranch) is a separate sentence excluding prior-acts coverage in certain instances. Northfield excluded coverage if the "damages" arose out of an "act, error, omission or prior litigation which is known by" the Ranch prior to January 1, 1999.

{¶ 17} The Ranch readily satisfies four of the five preconditions to coverage under the prior-acts endorsement. Andrew C.'s damages occurred during the specified time frame. The incident was an unintended and accidental occurrence from the standpoint of the Ranch. The alleged "damages [were] for covered 'bodily injury'." Likewise, there is no contention that Andrew C.'s claim could have been covered by the Scottsdale claims-made policy, since his claim was first presented years after the inception of the Northfield coverage. Whether Northfield owed coverage to its insured, therefore, turns upon whether "damages" from the incident "weren't known by [the Ranch] * * * prior to 01/01/1999."[3]

{¶ 18} Both the requirement for coverage (that damages "weren't known by" the Ranch) and the separately-stated exclusion (for "damages arising out of any act * * * which is known by the insured") essentially incorporated the "known loss" doctrine. The language used by Northfield as a prerequisite to prior-acts coverage is not ambiguous: in January 1999, did the Ranch know of damages caused to Andrew C.? That is readily answered. Nothing in the record suggests that it did. The stipulation of facts submitted by the parties proves only that the Ranch knew of the incident, not that it knew of any "damages" arising from it. Accordingly, whether coverage is available turns upon the next following sentence in the endorsement, which excludes coverage otherwise available for prior-acts.

### 3. The Ambiguous Exclusion Keyed to "Damages"

{¶ 19} After providing prior-acts coverage so long as five tests were met, Northfield set out several exclusions from coverage provided by its endorsement. The first is at issue here. This is a somewhat redundant exclusion for "any damages arising out of any act, error, omission or prior litigation which is known by the insured as of the inception of this policy."

{¶ 20} Northfield makes much of the broad words "any act," arguing that coverage is unavailable for "any act" that was "known" to have occurred, even if it was not known to be negligent or wrongful, so long as at some point "damages"

---

3. The initial letter by counsel for Andrew C. claimed both negligence in providing protection from assault by other patients and that Andrew C. was "over-medicated" after the incident in 1996.

arose from it. This exclusion from prior-acts coverage might be read that broadly because it is ambiguous and uncertain. However, such a broad reading would be improper. After all, virtually every "act" at the Ranch during the six years when it was insured on a claims-made basis by Scottsdale would be "known" to some employee, or at least would have been noted in a patient chart or other business record. As at most health-care facilities, careful observation of patients is the rule even when nothing unusual is occurring, and such observations do not turn on the prospect of a legal claim, much less acknowledgement of a known loss or of some cognizable damages. Yet if the court accepted Northfield's broad reading of the exclusion, there would be no prior-acts coverage at all, no matter how attenuated the delay between a known "act" and a legal claim to damages arising from that act. Andrew C.'s claim was not asserted until nearly six years after the incident. Given the ambiguity in Northfield's exclusion from prior-acts coverage, which it was intentionally selling to protect the Ranch against any inadvertent gap in protection, the court concludes that case law defining the "known loss" doctrine (and closely related insurance doctrines) is properly considered. Those rules are intended to prevent an insurer from being held responsible for a loss actually underway and known to be in progress, or which in some similar fashion takes away the fortuity feature of insurance. Such rules are properly considered to resolve this ambiguity and to understand the prior-acts coverage endorsement, given the set of facts presented here. Indeed, apart from policy language, Northfield argues that the "known loss" doctrine is applicable and results in no coverage.

{¶ 21} The court concludes that a narrow reading of the exclusion from prior-acts coverage is appropriate based upon the words used, ambiguous though they are, and is consistent with case law in most jurisdictions applying the "known loss" doctrine. That construction leads to a sensible understanding of the exclusion included in this short endorsement tailored to the perceived needs of the Ranch. It is also faithful to Ohio law in coverage disputes.

■ {¶ 22} At the outset, Ohio law teaches that a court should first attempt to understand a policy from the words actually used. While the key word "damages" was used in two places in the endorsement, Northfield included no definition of "damages" in the policy. Yet that word is explained in Ohio decisions involving insurance law: "The rules of construction then dictate we give the word its plain and ordinary meaning. 'Damages,' in the plural, is defined as "compensation in money imposed by law for loss * * *," Webster's New Collegiate Dictionary (9th Ed.1990) 323, and 'monetary compensation that may be recovered in court by someone who has suffered injury * * * through an unlawful act or omission of another.' Statsky, West's Legal Thesaurus & Dictionary (1985) 206. This court has stated, 'damages' has been defined as the

pecuniary compensation paid by a wrongdoer for the losses suffered by an injured person.' *Meek v. GEM Boat Service, Inc.* (1990), 69 Ohio App.3d 404, 409, 590 N.E.2d 1296, 1299, citing *Cincinnati v. Hafer* (1892), 49 Ohio St. 60, 67, 30 N.E. 197, 199; *Greer v. Knox Cty. Bd. of Commrs.* (1927), 33 Ohio App. 539, 169 N.E. 709; *Drayton v. Jiffee Chem. Corp.* (N.D.Ohio 1975), 395 F.Supp. 1081. Our examination of each of the definitions of 'damages' reveals that it is contemplated there be a tortious activity and that the tortfeasor, by operation of law, be liable to the injured party. This definition is consistent with our reading of the disputed clause in its totality." *Allied Moulded Prod., Inc. v. Keegan* (1992), 81 Ohio App.3d 424, 428, 611 N.E.2d 377.

{¶ 23} Recognizing that under common law the word "damages" is inexplicably tied to the concept of a tortfeasor who, by operation of law, becomes liable to an injured party, it follows that the absence of any claim for "damages" against the Ranch before 2002 should have significance in arriving at a proper understanding of the exclusionary language. The exclusion turns on "damages," not merely a known prior act. Beyond that, several other legal rules about "damages" aid in understanding Northfield's exclusion. Damages are not presumed in an ordinary action for a negligently caused personal or bodily injury under Ohio law. *Lautner v. Lin,* Franklin App. No. 04AP–983, 2005-Ohio-4549, 2005 WL 2087886, ¶ 16, citing *Younce v. Baker* (1966), 9 Ohio App.2d 259, 38 O.O.2d 316, 224 N.E.2d 144. On the other hand, damages are "rebuttably presumed" to have been suffered in a wrongful death case by virtue of R.C. 2125.02(A)(1). Similarly, nominal damages may be awarded in the absence of evidence of compensatory damages for certain intentional torts such as conversion. See, e.g., *Fisher v. Barker,* 159 Ohio App.3d 745, 2005-Ohio-1039, 825 N.E.2d 244, ¶ 11. Thus, a logical difficulty in reading Northfield's exclusion under an endorsement keyed to "damages" arises, in part, because most—but not all—tort claims do not necessarily result in "damages." Focused more specifically upon the facts in this case, in which the Ranch was not the active tortfeasor but, at most, secondarily negligent in allowing the incident to occur, one must observe that until Andrew C. actually made his claim in July 2002, it would have been pure speculation for the Ranch to suggest to Northfield that it might, somehow and someday, face a claim for "damages." The prior allegedly negligent "act" was "known," but "damages" attributable to it could not be presumed to exist. While the active wrongdoer, David M., arguably faced damages liability based upon his admitted assault upon Andrew C., the Ranch was in a far different position.

{¶ 24} The sophisticated parties to this prior-acts endorsement would have had no reason to exclude coverage for possible damages, either known or claimed. As of 1999, it required speculation to suggest that damages could be sought from the

Ranch rather than from the active tortfeasor. Thus, the mere fact that the Ranch was "aware of" an "act" that occurred three years before Northfield bound coverage, and for which no damages were known and no claim was suggested, simply cannot result in an elimination of the coverage specifically intended to protect against "Prior Acts." The "known loss" doctrine and related insurance rules speak squarely to this situation and teach that there should be coverage provided on these facts. Providing coverage to the Ranch does no violence to the reasonable expectations of insurers.

{¶ 25} Northfield argues that its policy exclusion is even broader than the "known loss" case law and operates to avoid coverage for every prior act, error, or omission lurking anywhere in the history of the Ranch before 1999. As suggested earlier, such a reading is too broad. The parties knew that the Ranch was a large, institutional-health-care setting. They must be presumed to have recognized that it had many employees and patients. Thus, deliberate treatment decisions, staffing decisions, delivery of meals and drugs, room assignment decisions like the one leading to the incident, and a whole panoply of other day-to-day conduct are needed to operate the Ranch and to treat adolescents. In such a large institutional setting, one must presume that at least one employee knew of virtually every prior "act" or recorded in patient records almost every prior "act" that took place during the six years between 1993 and 1999 when Scottsdale provided claims-made insurance. Carried to its logical extreme, therefore, Northfield's reading of the exclusion would deprive the Ranch of exactly the insurance that the prior-acts endorsement was purchased to provide. Such a huge gap in coverage cannot have been the intention of either party, particularly when both sides were sophisticated and worked through professional brokers in arranging this coverage. In short, an exclusion that referenced "any act, error, [or] omission" that might have been "known" cannot be applied as a trick phrase eliminating protection for prior acts that this endorsement so plainly was written to provide.[4]

{¶ 26} The record contains no suggestion that the Ranch knew of any "damages" in 1999.[5] Northfield's exclusion depends upon "damages," not merely upon

4. The last term in Northfield's policy exclusion does not result in any ambiguity. "[A]ny damages arising out of any * * * prior litigation" are also excluded, but the readily identifiable nature of "prior litigation" makes this specific exception from prior-acts coverage understandable. "Prior litigation" would be marked by a readily recognized event—a lawsuit—and the Ranch could face no uncertainty about coverage for such a specific matter if it had proceeded, as one would have expected, and already reported any suit under Scottsdale's claims-made policy.

5. Rieser's affidavit states that Andrew C. continued to receive treatment at the Ranch until August 1997, when he moved with his family to Georgia. Apparently, he still lived in Georgia

knowledge of some prior "act." Given the difficulty presented in understanding the words of the exclusion in this unusual factual context, however, the court concludes that the common law "known loss" doctrine is appropriately considered. Northfield's exclusion for "damages arising out of any act, error, [or] omission, * * * which is known by the Insured as of the inception date of this Policy" speaks to the same issues as the "known loss" case law.

### 4. The "Known Loss" Doctrine

{¶ 27} The "known loss" doctrine is a compilation of practical concepts intended to prevent a windfall for insureds and manifest unfairness for the insurance industry. An often cited decision of the California Supreme Court held that "as long as there remains uncertainty about damage or injury that may occur during the policy period and the imposition of *liability* upon the insured, and no legal obligation to pay third party claims has been established," then there is no "known loss." *Montrose Chem. Corp.*, 10 Cal.4th at 655, 42 Cal.Rptr.2d 324, supra, 913 P.2d 878. Some decisions also refer to the "known loss" doctrine as the "loss-in-progress" rule. Id. at 904. The known loss doctrine is also related to the "fortuity" doctrine. *Alcoa v. Aetna Cas. & Sur. Co.* (2000), 140 Wash.2d 517, 998 P.2d 856, 878. All of these concepts are premised upon the simple idea that, normally, one cannot buy insurance coverage for a loss already known to be in progress, or for a loss that the insured planned, intended, or is aware is substantially certain to occur. 43 American Jurisprudence 2d (2004), Insurance, Section 479. At least in some jurisdictions, the "known loss" doctrine is explicitly said to be "a fraud-based defense," because "once the loss has occurred, there is no longer any 'risk'." *Wooddale Builders, Inc. v. Maryland Cas.Co.* (Minn.App. 2005), 695 N.W.2d 399, 405. As reviewed hereinafter, nearly all "known loss" decisions differentiate between knowledge of a risk or a potential for loss and knowledge that a loss has actually occurred or is virtually certain to occur. It is clear that "[t]here is no bright-line test to determine whether and at what point in time the insured knew or had reason to know of the substantial probability of the loss at issue. The extent of the insured's knowledge of the loss must be determined on a case-by-case basis." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.* (1992), 154 Ill.2d 90, 104, 180 Ill.Dec. 691, 607 N.E.2d 1204.

{¶ 28} As a threshold issue, courts sometimes wrestle with whether the "known loss" doctrine should be recognized as part of the common law in their particular jurisdiction. See, e.g., *Peck v. Pub. Serv. Mut. Ins. Co.* (D.Conn.2005), 363 F.Supp.2d 137, 145–146. A common concern is that use of a "known loss" analysis may eclipse other insurance doctrines regarding concealment, misrepre-

---

when the 2002 claim was made. Northfield's letter denying the claim in October 2002 stated that Andrew C. ceased being a "resident" at the Ranch in March 1997.

sentation, or damages that are "expected or intended" by an insured. No appellate court in Ohio has applied the "known loss" doctrine. Judge Knepper's thoughtful opinion in *Owens–Corning Fiberglas v. Am. Centennial Ins. Co.* (1995), 74 Ohio Misc.2d 183, 194, .660 N.E.2d 770, declined to introduce the doctrine into Ohio insurance law. On the other hand, at least two Sixth Circuit decisions have referenced the implied requirement of "fortuity" in the insurance context as a fundamental principle of Ohio insurance law. *Arkwright*, 51 F.3d at 1281 and *Lumbermens Mut. Cas. Co. v. S–W Industries, Inc.* (C.A.6, 1994), 39 F.3d 1324, 1331. *Owens–Corning Fiberglas* reviewed case law on the "known loss" doctrine as it existed ten years ago, which reflected "the broad spectrum of standards applied, when determining whether coverage is prohibited because of a foreseen or known loss." Id., 74 Ohio Misc.2d at 193, 660 N.E.2d 770. Since 1995, however, the tenets of the "known loss" doctrine have become better defined. See, e.g., *Gen. Housewares Corp. v. National Sur. Corp.* (Ind.App. 2000), 741 N.E.2d 408, 415–17, and *Rohm & Haas Co. v. Continental Cas. Co.* (Pa.Super.1999), 732 A.2d 1236, 1256 (analyzing the known-loss doctrine and the fortuity doctrine). The prior-acts coverage promised to the Ranch by Northfield is appropriately examined having in mind the "known loss" doctrine as it has developed throughout many jurisdictions in the United States. Before examining recent decisions interpreting that doctrine, however, it is instructive to mention the decision in *Physicians Ins. Co. of Ohio v. Swanson* (1991), 58 Ohio St.3d 189, 569 N.E.2d 906.

{¶ 29} *Swanson* addressed an exclusion from liability coverage for "expected or intended" injuries. As recognized in *Owens–Corning Fiberglas* supra, 74 Ohio Misc.2d at 194, 660 N.E.2d 770, and in several "known loss" decisions from outside Ohio, the common exclusion for "expected or intended" injury is conceptually similar to the "known loss" doctrine. *Swanson* quoted a Pennsylvania Supreme Court decision observing that "[t]here is a very real distinction between intending an act and intending a result and the policy exclusion addresses itself quite clearly to the latter." Id. at 192, 569 N.E.2d 906. *Swanson* contrasted the situation when a boy struck a match to see where he was stepping during an intentional home break-in with the house fire he unintentionally caused when that match was dropped, as it burned down to the stem. On those facts, the expected or intended tort exclusion did not apply. One can intentionally change lanes on a highway, to use another of the court's examples, without thereby intending to force another driver into the ditch. Id. "[M]any injuries result from intentional acts, although the injuries themselves are wholly unintentional." Id. This line of reasoning, applied to Northfield's endorsement, suggests that it is proper under Ohio law to differentiate between an "act" that is "known," and possible "damages arising out of any act" for which there is no knowledge. Knowing of one does not mean there is knowledge of the other.

{¶ 30} The case law on the "known loss" doctrine leads to the same conclusion. Awareness by the Ranch of an act that might someday result in "damages" is not equivalent to knowledge of damages. *Inland Waters Pollution Control, Inc. v. Natl. Union Fire Ins. Co.* (C.A.6, 1993), 997 F.2d 172, addressed the "loss in progress" doctrine, a close relative of the "known loss" doctrine. Coverage was sought for pollution released from 55–gallon drums when they were crushed in a landfill in 1981, resulting in the release of liquids into the soil and groundwater that was not discovered until 1987. The Sixth Circuit found coverage "and emphasized the critical factor of the insured's awareness of impending loss, finding that even losses that have *already occurred* may be insured against, provided their occurrence is unknown to the parties at the time of insurance." Id. at 176. (Emphasis sic.) The court recognized that previous decisions require either "(1) an awareness of loss on the part of the insured or (2) an immediate threat of loss tantamount to foreknowledge in order for the doctrine to defeat coverage." Id. The Sixth Circuit thus summarized, "The lesson of these cases * * * is that the doctrine operates only where the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for." Id. at 178.

{¶ 31} Similarly, *Arkwright Ins.*, 51 F.3d 1277, dealt with damages sustained during removal of asbestos prior to the voluntary demolition of a campus building. The insurer successfully argued that the damages caused by deliberate asbestos removal were not a "fortuitous" loss covered by insurance, because the University made a deliberate decision to cause property damage in removing asbestos-containing materials before demolishing the building. The court concluded that "the state courts in Ohio have adopted a definition of fortuitous events that limits such events to those 'which so far as the parties to the contract are aware, are dependent on chance'." 51 F.3d, at 1284.

{¶ 32} *Stonewall Ins. Co. v. Asbestos Claims Mgt. Corp.* (C.A.2, 1995), 73 F.3d 1178, 1214–15, examined both the known-loss doctrine and the "expected or intended" issue. *Stonewall Ins.* held, "The 'known loss' defense requires consideration of whether, at the time the insured bought the policy (or the policy incepted), the loss was known. * * * Though NGC was aware, prior to the inception of many of the policies, that its products risked asbestosis and cancer diseases and had received a large number of claims, it was highly uncertain * * * as to the prospective number of injuries, the number of claims, the likelihood of successful claims, and the amount of ultimate losses it would be called upon to pay. NGC was fully entitled to replace the uncertainty of its exposure with the precision of insurance premiums and leave it to the insurers' underwriters to determine the appropriate premiums." Id., 73 F.3d at 1215. In other words, "an

insured's knowledge of a *risk* of losses does not bar indemnity coverage" under the "known loss" doctrine. (Emphasis sic.) Id.

{¶ 33} *Stonehenge Eng. Corp. v. Emp. Ins. of Wausau* (C.A.4, 2000), 201 F.3d 296, arose when general contractors sought coverage under CGL policies. Defects appeared in condominium foundations and balconies in 1989. Wausau undertook the risk in 1992–1995, after the owners' association had formally notified the contractors of difficulties and solicited a response to their lawyer. Nevertheless, the Fourth Circuit found coverage. It pointed out that the exact cause of the difficulties with the concrete was not known when coverage was bound. The insured only "knew of the obvious potential for problems with the remaining twenty-eight villa units" by 1992, after four floors had failed and were replaced. "Such knowledge on the part of Stonehenge, however, does not equate to knowledge prior to the effective dates of the Three Wausau Policies that imposition of liability upon it for construction of the lightweight concrete floors in all of the villa units was substantially certain to occur." Id., 201 F.3d at 303.

{¶ 34} *Natl. Union Fire Ins. of Pittsburgh, Pa. v. The Stroh Cos., Inc.* (C.A.2, 2001), 265 F.3d 97, examined both "fortuity" and "known loss" principles, finding them "integral to the nature of insurance" and thus applicable "as a matter of public policy, irrespective of specific policy terms." Id. at 107. "The 'known loss' defense is a variation on the fortuity theme. It holds that 'an insured may not obtain insurance to cover a loss that is known before the policy takes effect. [Citations omitted.]" Id. at 106. *Stroh Cos.* had "contaminated products insurance," but it excluded losses that, as of the inception date, the insured "knew or should have known had occurred or were likely to occur." Id. at 101. In 1996, Stroh bought Heileman Companies, including a plant in Georgia that bottled Arizona Iced Tea beverages. A product recall occurred after glass shards were discovered in several bottles of tea. National Union contended that Stroh knew or should have known of the problem before coverage was extended to Heileman by endorsement to an existing Stroh policy. After reviewing a number of decisions, including several relied upon in this case by Northfield, the Second Circuit rejected the known-loss argument. Even if on the day the policy was endorsed to cover Heileman "Stroh or Heileman knew of a broken glass problem that made a recall likely, it does not follow that the recall, and therefore the expenses in connection with the recall, were known * * * In other words, National Union seems to argue that the fortuity doctrine bars coverage not only for known losses but for *likely* losses, i.e. known enhanced risks. We have expressly rejected the existence of such a 'known risk' doctrine * * *" Therefore, the Second Circuit concluded that "there had been no 'Loss' at the time Heileman was added to the policy; there was only the risk of a 'Loss.' Even if

the risk was known, and known to be high, at that time—a question hotly in dispute—the known loss doctrine does not bar coverage." Id. at 108.

{¶ 35} There is not complete uniformity in the "known loss" decisions from around the country. At least for some courts, "[a]n insured's liability need not be fixed to a monetary certainty; if the known liability has occurred or is substantially certain to occur, the known loss doctrine bars coverage." *General Housewares*, 741 N.E.2d at 416–17, see, also, *Alcoa*, 998 P.2d at 878. On the other hand, in predicting New Jersey law, the Third Circuit held in *Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.* (C.A.3, 1997), 124 F.3d 508, 518, that "the known loss doctrine will bar coverage only when the legal liability of the insured is a certainty." Citing *Pittston Co. Ultramar*, supra, a recent Colorado appellate decision held that "coverage will not be defeated unless, at the time it entered into the insurance contract, the insured had a legal obligation to pay damages to a third party in connection with a loss." *Hoang v. Monterra Homes (Powderhorn) L.L.C.* (Colo.App.2005), ⸺ P.3d ⸺, ⸺, 2005 WL 427936 at *4.

{¶ 36} Like the Common Pleas Court for Lucas County in *Owens–Corning Fiberglas*, supra, this court concludes that "it is unnecessary to delve into the varying applications of 'known loss' in order to manufacture one coherent doctrine." 74 Ohio Misc.2d at 194–95, 660 N.E.2d 770. No matter how the doctrine is formulated in its fine points, the decisions emphasize the importance of "knowledge" actually possessed by an insured. Furthermore, the doctrine is triggered by an awareness that a loss is "certain" or "substantially certain." More is required than mere awareness of a potential risk of a loss or of the potential that damages may arise sometime in the future traceable to some act known to have occurred in the past.[6] Understood against that backdrop, the exclusion from coverage in Northfield's prior-acts endorsement does not defeat coverage here.

{¶ 37} While the Ranch was aware of the incident in 1996 while insured by Scottsdale, the Ranch acted responsibly and in no sense tried to take advantage of its insurer. The Ranch conducted an internal investigation, assisted in a criminal investigation, and participated in an investigation by Franklin County Children Services. ("FCCS"). Independent investigations were made by Grove City Police and by FCCS in 1996 and 1997, but ultimately neither investigation resulted in "specific allegations" of fault against the Ranch. This does not give rise to a "known loss" or satisfy the exclusion in Northfield's prior-acts endorse-

---

6. Ohio law on intentional torts is analogous: "[m]ere knowledge and appreciation of a risk, however, falls short of substantial certainty and does not by itself establish intent.[Citations omitted.]" *Brown v. FirstEnergy Corp.*, 159 Ohio App.3d 696, 2005-Ohio-712, 825 N.E.2d 206, at ¶ 12.

ment. A risk that the incident might produce a claim for damages can now be appreciated in hindsight. However, there is no "known risk" doctrine.

### 5. The Reasonable–Expectations Doctrine

{¶ 38} *Andersen v. Highland House Co.* (2001), 93 Ohio St.3d 547, 757 N.E.2d 329, generally recognized the "reasonable expectations doctrine" based upon the Restatement of the Law 2d, Contracts (1981), Section 211, Comment *f*. Relying upon decisions from other jurisdictions holding that a court is to "prevent an absurd and unreasonable result—one that was never clearly intended by [the insured] and one that was never clearly communicated by [the insurer]" the majority opinion addressed an insurance-coverage dispute. Id. at 551, 757 N.E.2d 329. While not formally adopting the reasonable-expectations doctrine, the majority in *Andersen* used comparable reasoning in concluding, "We would be remiss if we were to simply look to the bare words of the exclusion, ignore its *raison d'etre*, and apply it to situations" for which it was not intended. Id. at 552, 757 N.E.2d 329. Similarly, a three-judge plurality for the court discussed the reasonable-expectation doctrine in *Wallace v. Balint* (2002), 94 Ohio St.3d 182, 189, 761 N.E.2d 598, although acknowledging "there is not yet a majority on this court willing to accept the reasonable-expectations doctrine."

{¶ 39} Acting responsibly toward its residents and their families, the Ranch purchased liability insurance each year. When changing types of coverage, the Ranch purchased a specific endorsement promising retroactive insurance for "prior acts" for which no claim had been made. When Northfield first became the insurer for the Ranch in 1999, the expectations of these parties must reasonably be presumed to have been that some event could have happened and could be a "prior act" against which liability insurance would offer protection. In considering the conduct of these sophisticated parties and the insurance documents, no other conclusion is reasonable. In passing, it may also be observed that Northland would have been better served to have asked the Ranch whether it knew of any either " prior acts" or of "damages" from them before it offered this extra coverage, which looked back six years to 1993. Northfield did not ask. The parties have stipulated that Northfield did not even receive an application for coverage until five months after coverage was bound. Moreover, there is no claim that the application was fraudulent or intended to mislead Northfield. All of this plainly suggests, and Northfield's underwriter Rugnetta does not dispute in his affidavit, that the underwriting decision never turned upon an actual examination of the six-year history of the Ranch measured against reasonable actuarial standards.

{¶ 40} Northfield had the opportunity to ask questions about "prior acts," and had it later learned that the Ranch had been deceptive, such misconduct could

have offered Northfield the right to seek rescission under well-established insurance law. See, e.g., *Stroh Cos.*, 265 F.3d at 112. Having neglected to seek more detailed background in taking the application, all Northfield can say now is that it relied upon "the language of the Endorsement" to "accomplish the same task."

{¶ 41} While it appears that the Supreme Court has not formally adopted the reasonable-expectations doctrine, it does merit note that other Ohio decisions seek to arrive at a reasoned understanding of the meaning of insurance policies and other contracts by considering what the parties must have been thinking at the inception of their arrangement. "When 'construing an agreement, the court should prefer a meaning which gives it vitality rather than a meaning which renders its performance illegal or impossible.' *Kebe v. Nutro Machinery Corp.* (1985), 30 Ohio App.3d 175, 177, 30 OBR 316, 507 N.E.2d 369. Generally, 'courts disfavor contract interpretations which render contracts illusory or unenforceable.' *Harasyn v. Normandy Metals, Inc.* (July 28, 1988), Cuyahoga App. No. 53212, 1988 WL 86966, [revised on other grounds, 49 Ohio St.3d 173, 551 N.E.2d 962,] quoting *Liqui\*Lawn Corp. v. The Andersons* (April 10, 1986), Cuyahoga App. No. 50240, 1986 WL 4394." *Talbert v. Continental Cas. Co.*, 157 Ohio App.3d 469, 2004-Ohio-2608, 811 N.E.2d 1169, at ¶ 9.

{¶ 42} The decision by the Ohio Supreme Court in *Harasyn* illustrates the pragmatic approach taken to understanding what parties thought they would receive when buying insurance, which appears similar to the reasonable-expectations doctrine used in other jurisdictions. Part II of Justice Herbert Brown's majority opinion, and Justice Holmes's concurring opinion, are both instructive. *Harasyn* was among the cases in which Ohio courts have struggled to apply a general public policy against insurance coverage for intentional torts, frequently involving child sexual abuse or *Blankenship* "intentional" torts in the workplace. Both the majority and Justice Holmes refused to apply that public policy against coverage for intentional acts when an insurer sold specific "stop gap" coverage for workplace "intentional torts" in the aftermath of the landmark *Blankenship* decision. Justice Holmes reasoned, "These policies were actively promoted to Normandy and other employers, and Fireman's Fund having held out such coverage should not now be heard to deny liability upon such insurance policies sold during this period of time." 49 Ohio St.3d at 181, 551 N.E.2d 962 (Holmes, J., concurring.) Likewise, Justice Brown's majority opinion recognized that "if such coverage is excluded, the insured is left with essentially no coverage in return for the premiums paid to secure the supplemental endorsement." Id. at 178, 551 N.E.2d 962.

{¶ 43} The Ranch and Northfield were aided by their respective insurance brokers. Everyone agrees that a prior-acts endorsement was purchased to avoid

any gap in coverage that otherwise might exist due to the transition from claims-made coverage to an occurrence-based policy. The parties agree such "nose" coverage is a well-recognized insurance product, intended "to allow certain prior acts to be deemed occurrences covered by the new policy." A broad reading of the exclusion in that prior-acts coverage endorsement cannot have been within the contemplation of either the insurer or the insured.

### 6. Northfield's Remaining Arguments

{¶ 44} Northfield advances two other arguments to support denial of coverage. Northfield argues that the Ranch failed to notify it of the incident in a timely manner. Further, Northfield argues that coverage must be denied because Andrew C's claims for excessive medication fall outside of both the CGL and the PL coverages. For the reason set forth below, neither of these arguments avoids coverage for defense and for some portion of the settlement paid in 2003.

### a. The Notice Requirement

{¶ 45} The Northfield CGL policy provided that the Ranch "must see to it that we are notified as soon as practicable of an 'occurrence' . . . which may result in a claim." Under Ohio law, if an insured breaches a notice requirement, an insurer may be relieved of its obligation to provide coverage. However, an insured's delay in giving notice must be unreasonable and must prejudice the insurer. *Ferrando v. Auto–Owners Mut. Ins. Co.*, 98 Ohio St.3d 186, 2002-Ohio-7217, 781 N.E.2d 927, paragraph one of the syllabus. An unreasonable delay in giving notice is presumed prejudicial to the insurer absent evidence to the contrary. Id. The onus falls on the insured to demonstrate that unreasonably late notice caused no prejudice to the carrier. *Ormet Primary Aluminum Corp. v. Emp. Ins. of Wausau* (2000), 88 Ohio St.3d 292, 305, 725 N.E.2d 646. An insurer is entitled to receive "notice 'within a reasonable time in light of all the surrounding facts and circumstances'." *Ferrando,* supra, at ¶ 90.

{¶ 46} In view of the facts stipulated to exist here, the Ranch gave notice as soon as practicable in July 2002 after it was contacted by counsel for Andrew C. The underlying rationale of a notice provision is to allow an insurer to investigate and value a claim, to determine whether a claim is in fact covered by the policy, to control potential litigation and its cost, and sometimes to pursue subrogation. See, e.g., *Ormet Primary Aluminum,* supra, at 302–03, 725 N.E.2d 646; *Ruby v. Midwestern Indemn. Co.* (1988), 40 Ohio St.3d 159, 161, 532 N.E.2d 730, 732. Northfield was notified promptly after the first demand was made against the Ranch. Granted, notification occurred well after the incident. Yet even construing the evidence most favorably to Northfield, the Ranch acted as soon as was practicable under the circumstances. Notice was sent in the same month that the

Ranch first heard from the alleged victim. See *Goodyear Tire & Rubber v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, at ¶ 17. Northfield cannot convincingly assert that notice was practicable earlier, given all of the surrounding facts and circumstances. In passing, it may also be noted that it is hard to imagine any prejudice to Northfield even if notice by the Ranch had not been timely. The Ranch acted sensibly in engaging counsel and addressing the matter with deliberation so far as the record appears. The Ranch did not settle Andrew C.'s claim for roughly nine months after Northfield had formally denied coverage, and before doing so, it mediated the claim in a sensible effort to minimize the loss.

### b. Andrew C.'s Excessive Medication Claim

{¶ 47} Northfield's final argument is that Andrew C.'s claim was largely for professional negligence and that, as such, his claim is not covered. Northfield paints too broadly. "To be considered a 'professional service' for insurance purposes, a liability 'must arise out of the special risks inherent in the practice of the profession.' [Citation omitted.] This standard has been cited with approval by several courts across the country." *PMI Mort. Ins. Co. v. Am. Internatl. Speciality Lines Ins. Co.* (C.A.9, 2005), 394 F.3d 761, 766. A brief discussion of the point in *Cincinnati Ins. Co. v. Canton Fin.*, 5th Dist. No.2003CA0150, 2003-Ohio-7348, 2003 WL 23416084, at ¶ 35, is comparable. The multimillion-dollar claim for damages presented in July 2002 was based primarily upon the assignment of Andrew C. to a room with the assailant, alleged to have been older, much larger, and with a history of aggression. Making a room assignment was a generic, administrative decision. It did not require the exercise of specialized knowledge or skill. Beyond that, it has been agreed that counsel for Andrew C. also asserted in 2002 that Andrew had been "heavily medicated by the Ranch after the Incident." The parties also recognize that "alleged inadequate treatment at the Ranch thereafter, including but not limited to charges that Claimant was over-medicated" were in fact raised prior to final settlement.

{¶ 48} A claim addressed to overmedication could constitute a matter of professional negligence, but it is undisputed that the prior-acts coverage endorsement also tied in coverage under the PL coverage. The record does not fully address how the final settlement was negotiated by the Ranch and Andrew C., nor does it explain any allocation of funds between his claims or as may have been described in the resulting settlement. Indeed, currently, the record does not conclusively show whether any portion of the amount paid in settlement should be considered to have been allocated to any claim that Andrew C. had been overmedicated. See *Zurich Ins. Co. v. Killer Music, Inc.* (C.A.9, 1993), 998

F.2d 674, 679–80.  Northfield points out that the PL coverage excluded "damages arising out of the insured's acts or omissions as a doctor, physician or surgeon." But, the policy application signed in late May 1999 explicitly said that there were "medical facilities" at the Ranch and that "[n]urses [were] employed for health center, [and] various professional suppliers provide services on a contract basis." The parties have not identified any medication actually administered to Andrew C., nor how it was prescribed.  Thus, Northfield is not entitled to summary judgment in its favor on such issues.

{¶ 49} An insurer's duty to defend is separate and distinct from its duty to indemnify.  *Socony–Vacuum Oil Co. v. Continental Cas. Co.* (1945), 144 Ohio St. 382, 29 O.O. 563, 59 N.E.2d 199, paragraph one of the syllabus.  Because there was arguably coverage for at least some of Andrew C.'s claims, Northfield was obligated to provide the Ranch with a defense to the entire matter.  E.g., *Willoughby Hills v. Cincinnati Ins. Co.* (1984), 9 Ohio St.3d 177, 9 OBR 463, 459 N.E.2d 555, syllabus.  While no formal court documents were ever filed by Andrew C., Northfield was presented with a claim that triggered the duty of defense under Ohio law regardless of whether Northfield ultimately had a duty to indemnify the Ranch for all or part of a final settlement.  Having abandoned the Ranch, Northfield cannot now complain that the settlement made was unreasonable or too costly.  Northfield forfeited the right to control the defense once it unequivocally declined coverage, absent a showing of fraud, which is not asserted here.  *Sanderson v. Ohio Edison Co.* (1994), 69 Ohio St.3d 582, 586–87, 635 N.E.2d 19.

## IV.  Conclusion

{¶ 50} Pursuant to Count One of the complaint, the court finds and declares that the Ranch was entitled to coverage for defense of the claim pursued by Andrew C. in 2002.  The "known loss" doctrine and the exclusion from coverage in Northfield's prior-acts coverage endorsement did not defeat such coverage. Furthermore, the court finds and declares that the Ranch provided timely notice to Northfield.  Northfield is not entitled to summary judgment in its favor.

{¶ 51} There remain open questions as to whether the settlement ultimately reached by the Ranch related predominantly to administrative decisions at the Ranch, such as the assignment of roommates, or instead turned predominantly upon decisions involving acts or omissions of a professional nature and, if so, whether the exclusion in the PL coverage for conduct by physicians operates to deny reimbursement for some or all of the settlement paid.  The court will hold a status conference in chambers with all counsel to address the remaining factual and legal issues in this case and how they may most expeditiously be resolved.

So ordered.