The FISHEL COMPANY,

v.

REPUBLIC WESTERN INS. COMPANY.

2011-Ohio-2166.]

Court of Common Pleas of Ohio,
Franklin County.

No. 09–CVH–08–12052.

Decided Jan. 26, 2011.

Porter, Wright, Morris & Arthur, and Christopher C. Russell, for plaintiff.

Dinsmore & Shohl, L.L.P., Peter J. Georgiton, and Michael D. Eagen, for defendant.

FRYE, Judge.

## I. *Introduction*

{¶ 1} This case concerns a consent-to-settlement clause in an insurance policy written to backstop a self-insured business under Ohio's workers' compensation system. The Fishel Company was responsible for employee claims up to

$300,000. To protect itself above that self-insured retention, Fishel purchased a policy entitled "Excess Workers' Compensation Policy" sold by Republic Western Insurance Company.

{¶ 2} James R. Richards was a longtime Fishel employee. Nearly 20 years after Richards was injured in 1989—and after a knee prosthesis had been installed—Richards's orthopedic surgeon addressed continuing pain, swelling, weakness, restriction of motion, and the potential that Richards might even lose part of his leg if he did not cease work. Faced with that medical evidence, his employer executed a standard Industrial Commission form "Agreement as to Award for Permanent Total Disability." Fishel did not, however, file an "SI–42" settlement-notification form with the Bureau of Workers' Compensation or invoke R.C. 4123.65, which addresses settlements.

{¶ 3} Republic Western and Fishel dispute whether executing the agreement as to permanent total disability ran afoul of policy language that precluded coverage for a "voluntary settlement" made without the insurer's consent. Both parties agree that no Ohio court has interpreted such a voluntary-settlement exclusion.

## II. *The Factual Record*

{¶ 4} Counsel cooperated in filing a thorough stipulation of facts, for which the court is grateful. In addition, brief depositions were taken from Richards and from Craig Mathes, director of safety and human resources at Fishel. When cross-motions for summary judgment were argued earlier this month, both sides clarified several factual matters for the court (consistent with the record) and agreed that no genuine dispute of material fact exists.

{¶ 5} Richards was injured in 1989 and remained Fishel's employee thereafter. The company was aware of limitations on Richards's ability to work but respected him as a valuable employee. However, by early 2007, Richards's orthopedic physician, Dr. Louis Unverferth, wrote an opinion letter reviewing the case and concluding that Richards was permanently and totally disabled because of persistent difficulties related to the old knee injury. Richards also brought to Fishel's attention that his orthopedic doctor had advised him that if he did not stop work, he might even lose his leg. Recognizing that Richards had been with Fishel for many years and qualified for long-term and short-term disability benefits, payout of vacation, continuation of health insurance, and other benefits that needed to be integrated into the conversation, Fishel consulted legal counsel. Everyone at Fishel was satisfied that Richards had a very legitimate claim, so a

plan was made to coordinate all of Richards's benefits, including workers' compensation benefits.

{¶ 6} In considering whether the resulting resolution of Richards's claim for permanent total disability was a "settlement," it is relevant that over the 18 years since Richards's claim first arose, it had never been contested by Fishel. According to Mathes, given that background, the possibility of contesting Richards's permanent disability before the Industrial Commission in 2007 never came up.

{¶ 7} Fishel and Richards signed a standard-form Industrial Commission document entitled "Agreement as to Award for Permanent Total Disability." They did so without filing a form SI–42 with the BWC, but also without prior consent from Republic Western. As a consequence of the agreement, Fishel became obligated to pay benefits for permanent total disability to Richards for life under workers' compensation rules. This ran the cost of the claim above Fishel's $300,000 self-insured retention, triggering its request for coverage.

{¶ 8} The parties have not contested this case (as such cases often are contested) over whether there was actual prejudice to the insurer from lack of consent to settle. Instead, the parties agree that the issue is simply whether Fishel made a "voluntary settlement" as that term is used in the policy.

## III. *The Policy Provision*

{¶ 9} Republic Western sold a policy entitled "Excess Workers' Compensation Policy" to Fishel in 1987. That particular policy follows the Richards claim indefinitely because it was in force when he first sustained injury.

{¶ 10} The policy had a specific focus. It did not address general business liability as would a comprehensive general liability policy or other more common business insurance. Thus, the declarations page specifically stated: "This policy covers the Workers' Compensation law of each of the following states: * * * OHIO * * *." The insuring agreement specifies that the policy applies to loss sustained because of liability imposed by the "Workers' Compensation Act of each state named" on the declarations page. The first definition in the policy is of "Workers' Compensation Act," a term used repeatedly thereafter in the policy.

{¶ 11} Republic Western set out a number of specific numbered exclusions. The provision prohibiting "voluntary settlement" without the consent of the insurer is not among them. Instead, it was placed in a separately numbered paragraph entitled "Administration and Reporting of Claims." That clause initially addressed "immediate notice" of any occurrence causing serious injury to two or more employees; a fatality, spinal-cord injury, bad burn, or other obviously serious injury; or the reopening of a case in which further awards

might impose liability on the insurer. No argument is made here that Fishel did not report the Richards claim in an appropriate or timely fashion.

{¶ 12} The paragraph entitled "Administration and Reporting of Claims" continues: "The Insured shall not make any voluntary settlement or voluntarily make a lump-sum payment or commutation or one-time payment in lieu of periodic indemnity payments to Employees or their dependents involving loss to the Company except with the written consent of" the insurer's agent. A few weeks after the policy went into force, Republic Western issued an amendatory endorsement to it. That endorsement contained identical language relative to a voluntary settlement. However, neither the basic policy nor the endorsement defined the term "voluntary settlement."

## IV. *Settlements under Ohio Workers' Compensation Statutes*

{¶ 13} Ohio employers may submit an application for approval of a final settlement under a specific statute in the workers' compensation code. R.C. 4123.65. For self-insured companies, the forms used to do so are referred to as SI–42 ("Self–Insured Joint Settlement Agreement and Release") and SI–43 ("Acknowledgment of the Self–Insured Joint Settlement Agreement and Release"). The Richards file at the Bureau of Workers' Compensation contains neither form. Furthermore, "no other evidence" is in the file indicating that it "has been settled by and between the injured worker and the self-insuring employer" according to the BWC's director of the Self–Insurance Department. (Tom Woodruff's affidavit, filed with the complaint.)

{¶ 14} R.C. 4123.65 was amended in 1993 to allow more latitude for self-insured employers to directly negotiate settlements with employees. *Estate of Orecny v. Ford Motor Co.* (1996), 109 Ohio App.3d 462, 466, 672 N.E.2d 679, explained that as a result of those amendments, "[t]he self-insuring employer merely mails the settlement agreement to the administrator, * * * [who] can only disapprove if, within thirty days, he finds that a 'gross miscarriage of justice' has occurred." In *Orecny*, the employee and employer executed a "settlement agreement" and forwarded it to the Industrial Commission through the Cleveland office of the attorney general. Twelve days later the employee died, and the Industrial Commission claimed that the settlement had abated due to the employee's death. The court held to the contrary, finding that settlement was final prior to the death and that "there [was] no indication that either of the parties intended to withdraw from the settlement." Id. at 469.

{¶ 15} More recently, the Ohio Supreme Court addressed the interplay between settlement of a workers' compensation appeal in common pleas court and the special statutory provision in R.C. 4123.65 in *Gibson v. Meadow Gold Dairy* (2000), 88 Ohio St.3d 201, 724 N.E.2d 787. In *Gibson*, the court held that

"pursuant to R.C. 4123.65, settlements of claims against self-insured employers * * * are not binding until a final settlement agreement is signed by the parties and thirty days have passed thereafter." Id. at 204. That was true whether settlement was reached in common pleas court or at the administrative level. In reaching that conclusion, the four-justice majority recognized that " 'existing laws [are] read into contracts in order to fix obligations between the parties.' " Id., quoting *Home Bldg. & Loan Assn. v. Blaisdell* (1934), 290 U.S. 398, 435, 54 S.Ct. 231, 78 L.Ed. 413.

{¶ 16} The "Agreement as to Award for Permanent Total Disability" did not use the word "settlement." The instructions on the two-page Industrial Commission standard-form document stated that "[i]f all parties do not agree on all terms, this application will not be processed per Industrial Commission Rule." The instructions also said that the form was to be filed directly with the Claims Management Office of the commission. In substance, the agreement stated only that "[t]he parties below agree that the above injured worker is permanently and totally disabled due to the allowed conditions of the claims listed below and that an award of permanent total disability compensation should commence effective 6/22/07 * * *." On page 2 of the agreement Richards and the employer's agent Greg Graborec signed beneath additional language noting that, by signing, they "waive[d] a formal hearing and acknowledged[d] that a Commission order will be entered after decision on the written record." No Industrial Commission decision is in the record.

## V. *General Principles of Insurance Law*

{¶ 17} "In construing the terms of any contract, the principal objective is to determine the intention of the parties. Generally, contracts should be construed in a manner to give effect to the intentions of the parties." (Citation omitted.) *Hamilton Ins. Servs. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 273, 714 N.E.2d 898.

{¶ 18} " 'It is axiomatic that an insurance company is under no obligation to its insured, * * * unless the conduct alleged of the insured falls within the coverage of the policy.' *Gearing v. Nationwide Ins. Co.* (1996), 76 Ohio St.3d 34, 36, 665 N.E.2d 1115. 'Coverage is provided if the conduct falls within the scope of coverage defined in the policy, and not within an exception thereto.' Id." *Allstate Ins. Co. v. Campbell,* 128 Ohio St.3d 186, 2010-Ohio-6312, 942 N.E.2d 1090, at ¶ 8. "[T]he 'fundamental goal in insurance policy interpretation is to ascertain the intent of the parties from a reading of the contract in its entirety, and to settle upon a reasonable interpretation of any disputed terms in a manner calculated to give the agreement its intended effect.' *Burris v. Grange Mut. Cos.* (1989), 46 Ohio St.3d 84, 89, 545 N.E.2d 83. We have held that provisions in an

insurance contract that are reasonably susceptible of more than one interpretation will be construed liberally in favor of the insured. But this ' "rule will not be applied so as to provide an unreasonable interpretation of the words of the policy." ' Id. at ¶ 14, quoting *Morfoot v. Stake* (1963), 174 Ohio St. 506, 23 O.O.2d 144, 190 N.E.2d 573, paragraph one of the syllabus." (Citations omitted.) *Fed. Ins. Co. v. Executive Coach Luxury Travel, Inc.*, 128 Ohio St.3d 331, 2010-Ohio-6300, 944 N.E.2d 215, at ¶ 18 (Lundberg Stratton, J., dissenting).

{¶ 19} Ohio law provides that "[w]here exceptions, qualifications or exemptions are introduced into an insurance contract, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof." *Home Indemn. Co. v. Plymouth* (1945), 146 Ohio St. 96, 32 O.O. 30, 64 N.E.2d 248, paragraph two of the syllabus. Citing this holding in *Plymouth*, the Supreme Court more recently held: "Thus, in order to defeat coverage, 'the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question.' Reiter, Strasser & Pohlman, The Pollution Exclusion under Ohio Law: Staying the Course (1991), 59 U.Cin.L.Rev. 1165, 1179." *Andersen v. Highland House Co.* (2001), 93 Ohio St.3d 547, 549, 757 N.E.2d 329.

{¶ 20} As this court has observed previously, Ohio decisions "seek to arrive at a reasoned understanding of the meaning of insurance policies and other contracts by considering what the parties must have been thinking at the inception of their arrangement." *Buckeye Ranch, Inc. v. Northfield Ins. Co.*, 134 Ohio Misc.2d 10, 2005-Ohio-5316, 839 N.E.2d 94, ¶ 41. The Supreme Court has also noted that it "would be remiss * * * if we were to simply look to the bare words of the exclusion, ignore its *raison d'etre*, and apply it to situations" for which it was not intended. *Andersen* at 552.

{¶ 21} In the specific area in which this case falls, namely insurance written to address workers' compensation liability, an instructive decision is *Harasyn v. Normandy Metals, Inc.* (1990), 49 Ohio St.3d 173, 551 N.E.2d 962. *Harasyn* considered the general public policy in Ohio against providing insurance coverage for intentional torts in the context of insurance policies sold to protect employers against claims for "intentional" workplace torts. *Harasyn* considered the legal context in which the policy had been written, including statutes governing employer liability enacted in the aftermath of Ohio's landmark decision in *Blankenship v. Cincinnati Milacron Chems., Inc.* (1982), 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572. Justice Herbert Brown's majority opinion recognized that workers' compensation statutes were properly considered as the backdrop for such an insurance product. *Harasyn* at 177. Likewise, Justice Holmes reasoned: "These policies were actively promoted to Normandy and

other employers, and Fireman's Fund having held out such coverage should not now be heard to deny liability upon such insurance policies sold during this period of time." Id. at 181 (Holmes, J., concurring). *Harasyn* demands that the particular meaning of "settlement" in workers' compensation statutes inform the decision here.

## VI.  *Conclusion*

{¶ 22} Republic Western sold insurance addressing Fishel's potential workers' compensation exposure under Ohio law. It must be concluded that the provision addressing "voluntary settlement" used those words as they are understood in the workers' compensation field regulated by Ohio statutes.

{¶ 23} R.C. 4123.65 sets forth a procedure under which a self-insuring employer and its employee may make a "settlement." An employer using it obtains at least one collateral benefit that may not have been available to Fishel here. A settlement made under R.C. 4123.65 "is not appealable." In any event, Fishel and Richards did not use that statutory settlement procedure.

{¶ 24} Instead, Fishel merely did not dispute Richards's claim. That is, it passively conceded what it obviously deemed were well-established facts—"that the above injured worker is permanently and totally disabled due to the allowed conditions"—in signing the 2007 agreement. Passive acquiescence was not a voluntary settlement and did not demand the written consent of Fishel's insurer. Consider the difference between an admission of facts in a candid answer to an ordinary civil lawsuit, and a settlement of that lawsuit. An answer conceding key facts may inevitably lead to an adverse determination of the case, but that is not a settlement. There is a subtle but genuine difference. See also *Travelers Property Cas. Co. v. ConocoPhillips Co.* (C.A.9, 2008), 546 F.3d 1142, 1146 (holding that an insured did not violate a similar "voluntary payments" clause merely by waiving a statutory credit for workers' compensation payments. Such a clause "pertains only to the insured voluntarily making payments or incurring expenses and not to a non-monetary requirement simply to refrain from doing something").

{¶ 25} Republic Western's policy did not preclude its insured from admitting facts. That conclusion is consistent with the policy language when considered against the backdrop of Ohio workers' compensation statutes. That conclusion is buttressed by the legal rule that policy exceptions, qualifications, and exclusions are given force only when there is but one reading that can be fairly placed upon the language selected by the insurer.

{¶ 26} Judgment will be entered in favor of the Fishel Company and against Republic Western.

So ordered.